[No. 61967-5-I.   Division One.   December 28, 2009.]

*In the Matter of the Detention of* ROBERT DANFORTH.

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT DANFORTH, *Appellant*.

*Lila J. Silverstein* (of *Washington Appellate Project*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *David J. W. Hackett, Deputy*, for respondent.

¶1 GROSSE, J. — A sex offender's statement to authorities that he will inflict sexually violent harm against minor boys if he is not committed is sufficient evidence of a recent overt act to support a sexually violent predator (SVP) petition when that statement is considered in the context of the sex offender's history and mental condition. Robert Danforth contends that the trial court erred by denying his summary judgment motion because his statements to the authorities were not threats of harm but pleas for help to prevent him from inflicting harm and therefore amount to protected speech. But a threat that constitutes a recent overt act is not protected by the First Amendment because it produces harms distinct from its communicative impact and is based on the sex offender's conduct. Here, there was sufficient

evidence from which a jury could find that Danforth expressed an intent to inflict sexually violent harm and that his history and mental condition created a reasonable apprehension of such harm. Thus, the trial court properly denied the summary judgment motion and we affirm.

## FACTS

¶2 As a young child, Robert Danforth was subjected to both physical and emotional abuse by his parents. He was also diagnosed as suffering from borderline mental retardation and fetal alcohol effects caused by his mother's excessive drinking during her pregnancy. He had behavioral problems in school and was sent to a boarding school when he was 14 years old. He had his first sexual experiences at the boarding school and had sexual encounters with several of the boys at the school.

¶3 In 1970, at age 25, while employed as a maintenance worker in Cannon Beach, Oregon, Danforth had sexual contact with at least four boys between the ages of 7 and 13. When investigated by the police about these incidents, Danforth admitted that he was "sick" and needed help because he could not control himself sexually when he was around children. He was prosecuted for these offenses, but the case was apparently dismissed for a speedy trial violation.

¶4 In 1971, in Colfax, Washington, Danforth approached a group of boys at a ballpark and asked them if they wanted to have "sex play." He was prosecuted and pleaded guilty to charges of indecent liberties. The court ordered that he be sent for treatment at Western State Hospital, but after a short time there, he was found to be not amenable to treatment and sent to prison.

¶5 In August 1987, Danforth invited a 16-year-old boy and his friend to participate in group sexual activity with him. He was charged and convicted in King County with two counts of communication of a minor with immoral purposes, but the convictions were later reversed on appeal.

¶6 In 1993, Danforth was convicted of second degree rape in King County for forcibly raping a 12-year-old boy in the summer of 1987. The victim was participating in a play production and stepped outside in back of the theater during a rehearsal. Danforth hit him over the head with a rock, forcibly pulled down the boy's pants, and anally raped him, leaving the boy crying behind the theater. Danforth denied the allegations, refused treatment, and served prison time.

¶7 Danforth was released from prison in 1996 and did not commit any further sexual offenses while in the community. But he engaged in behavior that caused concern, including targeting and grooming young adult males, some of whom were developmentally disabled, and devising schemes that he hoped would lead to sexual contact with them. For example, he solicited churches and colleges seeking young men to be his driver, posing as someone who wanted to see tourist locations before he lost his sight to diabetes.

¶8 In 2002, Danforth called the King County Prosecuting Attorney's Office and requested to be civilly committed. He had apparently been subjected to repeated harassment by neighbors during this time, including vandalism of his home. He told a prosecutor that he lacked control and was afraid of reoffending if he were not committed. The State's psychologist, Dr. Charles Lund, evaluated Danforth but determined that commitment was not appropriate because the "problem [ ] sexual behavior" involved adults, not children. As Dr. Lund concluded:

> It is clear that [Danforth] has engaged in marginally appropriate sexual encounters with adults during the period he has been at large in the community, but there is no direct evidence of inappropriate overtures toward minors or self-reported involvement of sexualized encounters with minors.

¶9 On October 25, 2006, Danforth again appealed to authorities to civilly commit him. This time, he presented himself at the King County Sheriff's Office and asked to

speak with a detective. He told the detective that he had come to "turn himself in" because he felt like reoffending. He then gave a lengthy statement in which he described having sexual fantasies involving boys between the ages of 13 and 14. He also stated that he believed he was going to reoffend against underage boys if he were not taken into custody. He said he was afraid to be near children and needed to be in a facility permanently.

¶10 The detective arranged for two King County mental health professionals to assess Danforth. He reiterated to the mental health professionals that he would reoffend if not taken into custody. When asked what action he would take if not taken into custody, Danforth responded that he would go to a bus stop where boys were and try to have sex with them. He also said he would go to the arcade at the Southcenter Mall and rub up against the back of a 13- to 15-year-old boy for his sexual gratification, and if he found a boy who liked it, he would pursue "more." He was then arrested and gave a detailed recorded statement, which confirmed his previous statements that he would be "a serious danger to society if [he were] turned loose." He also clarified that his plan to "rub up against [a boy]" meant that he would rub his penis against "the back rectum of a boy."

¶11 The State then filed a petition under chapter 71.09 RCW to civilly commit Danforth as an SVP. The petition was supported by a declaration from Dr. Lund, who opined that Danforth suffered from pedophilia and was more likely than not to reoffend in a sexually violent manner. As Dr. Lund explained:

> The recent reports reviewed indicate that Mr. Danforth made explicit and specific statements of intent to commit sexual offenses against young boys. He has the ability to carry out the intervening actions to gain access to high risk situations where the offending would occur. The specificity of the threat is[,] professionally speaking, quite alarming and there is imminently a high risk of sexual reoffending, given the threat. His history of committing sexual offenses, his current reports of subjective experiences related to ongoing sexual interest in

young boys, masturbatory fantasies involving children, and his own self assessment of being at high risk would constitute a combination of historical and dynamic factors that are of extreme concern, in the absence of external constraints on opportunities to reoffend against a child.

Thus, from a professional perspective, I would consider the recent incident to be not just the basis for apprehension of harm of a sexually violent nature, but the basis for outright alarm, and hold this opinion to a reasonable degree of psychological certainty.

Dr. Lund affirmed this opinion in a July 2007 supplemental report:

It is my continuing professional opinion, to a reasonable degree of psychological certainty, that the statement of intent to have sexual contact with a child is extremely alarming from a professional perspective, well beyond the threshold of apprehension, and would constitute a recent overt act, according to the statutory definition of recent overt act.

¶12 While awaiting trial, Danforth was transferred to the Special Commitment Center, where he was interviewed by Dr. Lund. He told Dr. Lund that he now had "no desire related to boys under 21," and that he requested commitment only because he needed a place of refuge from harassment from the community.

¶13 Before trial, Danforth moved for summary judgment, arguing that the SVP petition should be dismissed because the State failed to establish that he committed a recent overt act. He contended that the statements the State alleged to be the recent overt act did not rise to the level of a constitutionally valid threat of danger to the community. The trial court denied the motion, ruling that there was sufficient evidence from which a jury could find that he committed a recent overt act. A few days into the trial proceedings, just before jury selection, Danforth stipulated to his civil commitment as an SVP but reserved his right to appeal the trial court's denial of his summary judgment. He now appeals.

## ANALYSIS

¶14 Danforth contends that the trial court erred by denying his motion for summary judgment because the State failed to establish as a matter of law that he committed a recent overt act. He argues that telling authorities that he feared he might reoffend if not confined does not amount to a threat, much less a true threat, which he contends is required to withstand a First Amendment challenge to the statute.

¶15 We review summary judgment rulings de novo.[1] A party is entitled to summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2] All facts must be viewed in the light most favorable to the nonmoving party.[3]

¶16 To support a petition alleging that an offender is a sexually violent predator, the State must prove beyond a reasonable doubt that the offender "would be likely to engage in predatory acts of sexual violence if not confined in a secure facility."[4] When the offender is not incarcerated at the time the State files the SVP petition, due process requires that the State also "prove present dangerousness with evidence of a recent overt act."[5] A "recent overt act" includes threats and is defined as

any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person

---

[1] *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006).

[2] CR 56(c); *Huff v. Budbill*, 141 Wn.2d 1, 7, 1 P.3d 1138 (2000).

[3] *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

[4] RCW 71.09.060(1).

[5] *In re Det. of Lewis*, 163 Wn.2d 188, 194, 177 P.3d 708 (2008); RCW 71.09.060(1).

who knows of the history and mental condition of the person engaging in the act.[6]

¶17 Danforth first contends that his statements that he feared he would reoffend if not committed do not constitute a threat under the plain meaning of RCW 71.09.020. Because the statute does not define the term "threat," it is given its ordinary and common law meaning.[7] Both parties cite the dictionary definition and appear to agree that the ordinary meaning of "threat" is an "expression of an intention to inflict loss or harm on another."[8]

¶18 Viewed in the light most favorable to the nonmoving party (the State), the evidence is sufficient to establish that Danforth expressed an intent to inflict harm. Danforth described a specific plan to molest minor boys and told authorities he would carry out the plan if not committed. Danforth contends that these statements established only an intent to prevent harm, not inflict it. But this does not change the fact that he did express his intent to inflict the harm. This expressed intent alone established the threat, regardless of whether he wished to prevent it from being carried out.[9] The trial court therefore properly denied the summary judgment motion and concluded that there was sufficient evidence to submit to the jury on the issue of whether he committed a recent overt act.

¶19 Danforth next argues that unless the statute's definition of "recent overt act" is limited to true threats, it is unconstitutionally overbroad because it encompasses constitutionally protected speech. He contends that his statements do not amount to true threats because they were conditional statements that he would harm others unless he received help.

---

[6] RCW 71.09.020(12).

[7] *City of Redmond v. Burkhart*, 99 Wn. App. 21, 24, 991 P.2d 717 (2000).

[8] Webster's Third New International Dictionary 2382 (2002).

[9] Indeed, our courts have acknowledged that proof of intent to carry out a threat is not required to support a conviction for threats prosecuted under the felony harassment statute. *State v. Kilburn*, 151 Wn.2d 36, 38, 84 P.3d 1215 (2004).

¶20 A statute that regulates pure speech implicates the First Amendment.[10] A law is unconstitutionally overbroad if it sweeps within its prohibitions conduct protected by the First Amendment.[11] But certain categories of speech are not protected, including "true threats."[12] Our state Supreme Court has held that threats prosecuted under the felony harassment statute must be limited to true threats to avoid unconstitutional infringement of protected speech.[13] In doing so, the court recognized that the statute implicated First Amendment protections because it regulated "pure speech" by criminalizing threats to inflict bodily harm.[14]

¶21 Danforth argues that like the felony harassment statute, chapter 71.09 RCW regulates speech by authorizing the State to petition for involuntary commitment based on a threat to cause harm of a sexually violent nature. Thus, he contends, the SVP statute must apply only to true threats to withstand an overbreadth challenge and avoid reaching protected speech. The State argues that because additional proof of conduct is required to establish a recent overt act, the statute does not regulate pure speech and the true threat analysis therefore does not apply. We agree with the State.

¶22 As the State points out, chapter 71.09 RCW does not penalize threats to reoffend in a sexually violent manner, nor does it authorize civil commitment based on such threats alone. Rather, the statute's focus is on the impact of the sex offender's conduct on the community, i.e., present dangerousness, which is established by proof of a recent

---

[10] *State v. Johnston*, 156 Wn.2d 355, 360, 127 P.3d 707 (2006).

[11] *State v. Halstien*, 122 Wn.2d 109, 121-22, 857 P.2d 270 (1993).

[12] *Johnston*, 156 Wn.2d at 360.

[13] *State v. Williams*, 144 Wn.2d 197, 208, 26 P.3d 890 (2001); *Kilburn*, 151 Wn.2d at 43.

[14] *Kilburn*, 151 Wn.2d at 41 (citing *Williams*, 144 Wn.2d at 206-07).

overt act.[15] This requires more than showing a threat to reoffend; the State must also show that the offender's mental condition and history create a reasonable apprehension of such harm from an objective viewpoint. Thus, because the threats must be evaluated in the context of the offender's conduct, i.e., the offender's history and mental condition, the statute does not regulate pure speech. Rather, it allows the State to establish current dangerousness with proof of a threat that would create a reasonable apprehension of harm based on the sex offender's conduct.

¶23 As established Supreme Court precedent recognizes, "[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection."[16] Threats used to establish a recent overt act under chapter 71.09 RCW produce such special harms and are therefore not entitled to First Amendment protection. Indeed, as the State points out, by requiring that the threat create a reasonable apprehension of harm from the viewpoint of one who is aware of the sex offender's history and mental condition, the recent overt act statute actually incorporates the "true threat" concept.[17]

¶24 But even under a true threat analysis, there was sufficient evidence to submit to the jury. The undisputed evidence does not establish that Danforth's threats to molest young boys were made in jest, idle talk, or political

---

[15] *Lewis*, 163 Wn.2d at 194; RCW 71.09.060(1).

[16] *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984); *see also Nat'l Ass'n for Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S. 886, 916, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) ("The First Amendment does not protect violence.").

[17] "A 'true threat' is a 'statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of another person.' " *State v. Tellez*, 141 Wn. App. 479, 482, 170 P.3d 75 (2007) (alteration in original) (internal quotation marks omitted) (quoting *Kilburn*, 151 Wn.2d at 43).

argument.[18] To the contrary, viewed in the light most favorable to the State, the evidence shows that they were made precisely to be taken seriously. He told the authorities that he was alerting them because he could not control himself and if they did not confine him, he would carry out his plans to sexually harm minor boys. Dr. Lund also concluded that Danforth was at high risk to reoffend and based on his history, was sincere in making these threats. As he opined, "The specificity of the threat is[,] professionally speaking, quite alarming and there is imminently a high risk of sexual reoffending, given the threat."[19] The cases Danforth cites in which he claims "statements far more chilling" were found to be protected speech involved statements that were clearly political argument or the context was clear that they were made in jest.[20]

¶25 Finally, Danforth contends that as applied to the facts here, the definition of "recent overt act" is unconstitutionally vague because it does not give sufficient notice that requests for help amount to a threat that will support an SVP petition. A statute is unconstitutionally vague under the Fourteenth Amendment if it is "framed in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its appli-

---

[18] A threat said in jest, idle talk, or political argument is not a "true threat." *See Johnston*, 156 Wn.2d at 361 (citing *Kilburn*, 151 Wn.2d at 43).

[19] Danforth's reliance on evidence suggesting that he made up his story because he wanted to escape his neighbors' harassment simply raises a disputed issue of fact, precluding summary judgment.

[20] In *Watts v. United States*, 394 U.S. 705, 706-08, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969), the court described the statement " 'If they ever make me carry a rifle, the first man I want to get in my sights is L.B.J.' " as "political hyperbole" and agreed with the petitioner "that his only offense here was 'a kind of very crude offensive method of stating a political opposition to the President.' " In *Claiborne Hardware*, 458 U.S. at 902, the statement " 'If we catch any of you going in any of them racist stores, we're gonna break your damn neck' " was part of a political speech made during a Civil Rights protest to encourage a boycott of white-owned business. Finally, in *Kilburn*, the evidence showed that the statement " 'I'm going to bring a gun to school tomorrow and shoot everyone and start with you' " was meant in jest because alleged victim was not scared by the statement, the defendant often joked with her and treated her kindly, and the defendant was giggling as he made the comments. 151 Wn.2d at 39, 52-53.

cation."[21] Determining whether a statute sufficiently defines an offense "does not demand impossible standards of specificity or absolute agreement."[22]

¶26 Here, Danforth fails to demonstrate that reasonable minds could differ on the use of the term "threat" in the "recent overt act" definition. Indeed, as discussed above, he and the State agree that its ordinary meaning is an expressed intent to inflict harm and his statements to the authorities that he would sexually reoffend against minor boys if not committed unquestionably fall within this definition. More significantly, Danforth was well aware that his threat of sexually violent harm would support an SVP petition for civil commitment; this is precisely why he made the threats and, in doing so, he clearly acknowledged that such behavior would result in civil commitment. His vagueness argument is without merit.

¶27 We affirm.

APPELWICK and LEACH, JJ., concur.

Review granted at 168 Wn.2d 1036 (2010).

---

[21] *State v. White*, 97 Wn.2d 92, 98-99, 640 P.2d 1061 (1982).

[22] *City of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990) (citing *Kolender v. Lawson*, 461 U.S. 352, 361, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)).