251 P.3d 917 (2011)
In re the DETENTION OF James ASTON, Jr., Appellant.
No. 64264-2-I.
Court of Appeals of Washington, Division 1.
May 16, 2011.
*919 Jennifer J. Sweigert, Attorney at Law, Nielsen Broman & Koch PLLC, Seattle, WA, for Appellant.
David J.W. Hackett, King Co. Pros. Office, Alison Moore Bogar, King County Prosecutor's Office, Seattle, WA, for Respondent.

PUBLISHED IN PART
COX, J.
¶ 1 James Aston, Jr., appeals his civil commitment as a sexually violent predator (SVP). We hold that the State provided sufficient evidence to prove beyond a reasonable doubt that Aston committed a recent overt act, as defined by RCW 71.09.020(10), and is an SVP. Moreover, a unanimity instruction was not required for the jury to decide that he committed a recent overt act. The trial court did not abuse its discretion in denying his motion for a mistrial. Likewise, it did not abuse its discretion or violate his right to an impartial jury by setting time limits for voir dire. We affirm.
¶ 2 Aston was convicted of rape of a child in the first degree in 1999. He was released to community custody in January 2006.
¶ 3 During his release, Aston exhibited a number of behaviors on which the State later relied to support its claim that he is an SVP. Among these behaviors was Aston's statement to his Community Custody Officer (CCO) that he would reoffend if given the opportunity. He wrote out fantasies about children that he used for masturbation before destroying the writings. He also used movies about children for sexual arousal.
¶ 4 Following Aston's last arrest by his CCO for violating conditions of his release, the State commenced this proceeding. The trial court found probable cause to believe that Aston was an SVP and directed further evaluations of him while he was confined awaiting trial. A unanimous jury found that Aston is an SVP. The trial court ordered his involuntary commitment.
¶ 5 Aston appeals.

SUFFICIENCY OF THE EVIDENCE
¶ 6 Aston argues that the State presented insufficient evidence to prove that he committed a recent overt act. We disagree.
¶ 7 The State may involuntarily commit an individual to a secure treatment facility if the jury finds he is an SVP.[1] RCW 71.09.020(18) defines an SVP as:
any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility.
¶ 8 If the person is living in the community after release from custody at the time the petition for involuntary commitment is filed, the State must also prove that the person committed a recent overt act.[2] A "recent overt act" is currently defined as:
any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act or behaviors.[[3]]
"The basis for involuntary civil commitment is the person's dangerousness."[4] Proof that a person committed a recent overt act is necessary to establish the respondent's current dangerousness.[5]
¶ 9 The State must prove beyond a reasonable doubt both that the person is an SVP and, when applicable, that the person committed a recent overt act.[6]
*920 ¶ 10 To determine whether the jury's verdict in an SVP case was based on sufficient evidence, we must determine whether the evidence, viewed in a light most favorable to the State, is sufficient to persuade a fair minded rational person that the State has proven beyond a reasonable doubt that the respondent is a sexually violent predator.[7] There is substantial evidence if a rational trier of fact could have found each means of fulfilling the SVP requirements was proved beyond a reasonable doubt.[8]
¶ 11 Here, Aston does not contest that he was convicted of first degree rape of a child in 1999. As a crime of sexual violence, that conviction satisfies the first element of the SVP definition. Likewise, he does not dispute the sufficiency of the evidence that he "either suffers from a mental abnormality or personality disorder which makes [him] likely to engage in predatory acts of sexual violence if not confined in a secure facility." This is the second element that the State must prove. The question is whether the State carried its burden to prove beyond a reasonable doubt that he committed a "recent overt act," as defined by the statute.
¶ 12 At trial, CCO Patrick Austin testified that he supervised Aston from October to December 2006. He described his meeting with Aston on November 9, 2006:
[Prosecutor]: So, after November 6th, did you see him again on November 9th?
[Austin]: I did see him on November 9th.
[Prosecutor]: And did [Aston]do you recall him talking about fantasies on November 9th?
[Austin]: Yes. He told me that heI believe he brought some fantasies in, and talked to me about them. We also went over him rewriting fantasies and that he would destroy them.
[Prosecutor]: Do you recall if he brought you in some stories at that time?
[Austin]: I believe he did.
[Prosecutor]: Did he hand them directly to you?
[Austin]: I believe he did.
[Prosecutor]: Did Mr. Aston say anything to you on November 9th, 2006[,] that caused you concern?
[Austin]: Yes.
[Prosecutor]: What did he say?
[Austin]: He said that if he was given the opportunity to reoffend, he would.
[Prosecutor]: All right. And why did that cause you concern?
[Austin]: I believed him. I was concerned for the community.[[9]]
¶ 13 Aston also reported to CCO Austin that he was writing sexual and deviant fantasies about children:
[Prosecutor]: Okay. Did Mr. Aston report to you he was having deviant fantasies?
[Austin]: He did. Hewe had discussions about it, due to the fact that I already knew previously that he was having these issues. And at one point he came into the office in October and informed me that he was concerned about taking a polygraph. And Ikind of just went through and discussed what was going on with him. And he said he was writing stories about children, sexual deviant fantasies about children and mutilating them.[[10]]
¶ 14 CCO Austin further testified to Aston's use of movies for sexual purposes. He testified as follows:
[Prosecutor]: Tell us about the possession of the child pornography. What was what was thewhat did Mr. Aston tell you that he had possessed?
[Austin]: He had possessed certain movies and was fantasizing about children in the movies.
[Prosecutor]: Which movies?
[Austin]: One was Hers, Mine, and Ours.
[Prosecutor]: Yours, Mine, and Ours?

*921 [Austin]: Yours, Mine, and Ours, that sounds right. And the other was Harry Potter movies.
[Prosecutor]: And what did he do with the Yours, Mine and Ours?
[Austin]: He stated that he would get to a certain scene where there's a couple infants on there. And he'd pause it at a certain location in the video and masturbate to it.
[Prosecutor]: Did he also tell you that he was masturbating to deviant fantasies about these infants?
[Austin]: I'd actually have to look at my notes. He admitted to me a lot of times about masturbating about children.
[Prosecutor]: Okay. Go ahead and look at 951.
[Austin]: Yes, he had done it. He would later on fantasize about that scene and masturbate to it.
[Prosecutor]: And did he tell you that hehow many times he viewed the move?
[Austin]: More than once.[[11]]
¶ 15 CCO Kevin Jones also testified at trial. He supervised Aston from January to September 2006.[12] CCO Jones testified that Aston reported to him that he purchased and masturbated to a book that had a sexual theme of an adult male having mind control over a minor, naked female.
¶ 16 Aston also admitted to CCO Jones that he was writing out fantasies:
Q. Do you recall what those fantasies were?
A. He documented explicitly four of them to me. One of them involved giving a 15-year-old a ride and having sex with her to pay for the ride. One involved giving an eight-year-old minor female a bath and playing with her genitals. One involved an adult female having sex with her younger daughter. I believe the last one was forcibly raping a six-year-old anally, orally, and vaginally.
Q. What did he tell you about these fantasies specifically? What he was doing with these fantasies.
A. He'd write these fantasies in stories and then he would masturbate to them. And then he would rip the stories up and flush them down the toilet.
Q. Did he tell you were these all the stories that he had written?
A. No. I believe he said up to ten, if I remember correctly, and those were the only four that I could get him to talk about or fully report on.
Q. Okay. What aboutwhat did he say he had done with those stories?
A. After he was done masturbating to them, he said he ripped them up and flushed them down the toilet.
Q. Did he say whether or not all of the stories had been destroyed?
A. No. He said he had one more story about sex abuse of a minor that he had hidden in his mom and dad's room....[[13]]
¶ 17 Dr. Brian Judd, a licensed psychologist, testified that Aston suffers from the sexual disorder pedophilia. He summarized his opinion as follows:
[T]raditionally, it appears that there's been a three-step process for Mr. Aston: The first being sexually deviant fantasies, and then targeting individuals in the community, actual individuals, and then offending. And certainly, from the standpoint that he was in treatment, he was under supervision, he was told not to be writing these kinds of fantasies, these pornographic fantasies involving children, he had met theif you will, the first step. I mean, he wasn't able to go online to actually pull down the pornography as he had before, but he was generating his own.
Second is, we have at least two reports of him visually targeting individuals in the community, girls that were in his preferred victim range, which is 4 to 9 years of age, and experiencing arousal to that, which he reported on various interviews. So from my standpoint, it strikes me that he was *922 having difficulty controlling his sexual urges at this point in time. And that the next logical step, based upon what we know of his prior history, is that he would have offended.[[14]]
¶ 18 Dr. Judd explained that Aston's written fantasies were concerning because he wasn't just a passive recipient of them. He was actively generating them and spending a lot of effort writing them down. He concluded that, based on these acts, Aston is "likely to engage in predatory acts of sexual violence if not confined to a secure facility."
¶ 19 This evidence is sufficient to prove beyond a reasonable doubt that Aston committed a recent overt act, based on the instruction given to the jury.[15]
¶ 20 First, there is sufficient evidence that Aston made a "threat." In In re Detention of Danforth,[16] this court concluded that a respondent's statement that he would reoffend is a "threat" under the plain words of RCW 71.09.020.[17] Although the statute does not define the term "threat," this court held that such a statement is a threat, based on the ordinary and common law meaning that a "threat" is an "`expression of an intention to inflict loss or harm on another.'"[18] Viewed in the light most favorable to the State, Aston's statement that "if he was given the opportunity to reoffend, he would" is sufficient to establish that he expressed an intent to inflict harm.[19]
¶ 21 Next, there is also sufficient evidence that Aston committed an "act." Aston was actively writing deviant sexual fantasies about children and masturbating to them. He was also watching children's movies and masturbating to fantasies about the child actors.
¶ 22 Finally, there is sufficient evidence of a "combination" of an act or a threat. As described above, Aston met with CCO Austin on November 9, 2006. During that meeting, Aston brought with him some of the fantasies he had written. He also admitted to CCO Austin that he would reoffend if given the opportunity. Aston's threat and the evidence of his acts of writing sexual fantasies about children is sufficient evidence of a "combination" of an act and a threat.
¶ 23 This case is analogous to In re Detention of Broten.[20] There, the respondent challenged his commitment as an SVP, claiming that there was insufficient evidence that he committed a recent overt act.[21] The State presented evidence that Broten parked his vehicle near a playground.[22] It relied upon that incident as the "recent overt act."[23] At trial, a licensed psychologist testified that Broten's mental disorders and personality disorders made him unable to control his sexual behavior and highly likely to reoffend.[24] He also testified that "Broten's behavior of frequenting locations where minors could reasonably be expected to congregate was part of [his] `offense cycle,' or a `buildup... in anticipation of offending.'"[25] The court held that there was sufficient evidence:
[Broten's presence at the playground], taken together with [his] mental history, numerous release violations, admission of *923 fantasizing about molesting and raping young girls, and pattern of placing himself in high risk situations in anticipation of causing sexually violent harm, constituted a recent overt act.[[26]]
¶ 24 As in Broten, this record sufficiently supports the jury's finding that Aston committed a recent overt act. In addition to the acts and threat described above, Dr. Judd testified that Aston suffers from pedophilia and that writing fantasies is part of his "offense cycle." This was sufficient evidence for the jury to find that Aston's behavior created a reasonable apprehension of sexually violent harm in the mind of an objective person who knows of his history and mental condition.
¶ 25 Aston argues that Broten is distinguishable because the court did not consider whether Broten's fantasies, taken alone, could constitute a recent overt act. He argues that the State must produce evidence of some act besides his fantasies. But, here the State did produce evidence that Aston committed other acts. As described above, there was evidence that Aston wrote out sexual fantasies about children and masturbated to them and that he used children's movies for sexual stimulation. Therefore, Aston's attempt to distinguish Broten is not persuasive
¶ 26 Aston also argues that his statement that he would re-offend if given the opportunity was not sufficient to prove a recent overt act because it was not a true threat, as required by the First Amendment.[27] He also argues that if the statement qualifies as a "threat" for the purposes of identifying a recent overt act, the result is that the statute is unconstitutionally vague. These arguments are controlled by Danforth.
¶ 27 There, Danforth went to a police station and told detectives to take him into custody because he was going to reoffend.[28] He explained that he was having fantasies about minor boys and, if the police did not arrest him, he was going to go to a bus stop or go to the Southcenter Mall arcade and reoffend.[29] The State petitioned to civilly commit Danforth as an SVP, arguing that these threats constituted a recent overt act.[30] On appeal, Danforth argued that the First Amendment required the State prove these statements were true threats before it could use them against him.[31] He also argued that the recent overt act definition is unconstitutionally vague because it does not give sufficient notice that a request for help will support an SVP petition.[32]
¶ 28 This court disagreed with both arguments. It held that the statute is not subject to a true threat requirement because additional proof of conduct is required to establish a recent overt act.[33] Thus, the statute does not regulate pure speech.[34] Additionally, it held that the statute was not unconstitutionally vague because a person of common intelligence would understand that stating an intent to sexually abuse minors is a threat, within the plain definition of the word.[35] Based upon these holdings, Aston's threat to reoffend does not require a true threat analysis. Moreover, the statute is not unconstitutionally vague.
¶ 29 Finally, Aston argues that "A combination of protected speech, private thoughts, and intimate conduct involving no other person cannot be a `recent overt act' under the statute."[36] Specifically, he claims that no Washington court, other than the Danforth court, has upheld such a finding.[37] He cites a number of cases that discuss recent overt acts involving different facts.
*924 ¶ 30 Past cases do not, necessarily, mark the outer limits of what the statute permits. Each case is to be decided on the basis of its own facts.[38] Moreover, the recent amendment of the statute to expand the definition of recent overt act could not have been the subject of prior cases. As we have already discussed in this opinion, there is sufficient evidence of multiple acts and a threat that either individually or together fit the plain words of the current definition of recent overt act. Thus, we cannot agree with this argument.
¶ 31 Viewing the evidence in the light most favorable to the State, there was sufficient evidence to persuade beyond a reasonable doubt a fair minded rational jury that Aston committed a recent overt act.

UNANIMITY INSTRUCTION
¶ 32 Aston next argues that he was denied his right to a unanimous jury verdict. Specifically, he claims that a jury must unanimously agree which "act, threat, or combination thereof" supports its finding of a "recent overt act" to show that he is an SVP.
¶ 33 The State responds in two ways. First, it claims that the 2009 statutory amendment to the definition of "recent overt act" obviates the need for a Petrich[39] instruction. Specifically, the State claims that the addition of the words "or combination thereof" to the previous definition of "any act or threat" in defining "recent overt act" encompasses all of a respondent's behavior as a single act.[40] Second and alternatively, the State argues that unanimity on the particular act or threat is not required under the "means within a means" analysis discussed and applied in In re Detention of Sease.[41]
¶ 34 A trial court's decision whether to give a particular instruction to the jury is a matter that this court reviews for abuse of discretion.[42] Refusal to give a particular instruction is an abuse of discretion only if the decision was "manifestly unreasonable, or [the court's] discretion was exercised on untenable grounds, or for untenable reasons."[43]
¶ 35 Whether a jury must be unanimous as to which of the statutory alternatives specified as recent overt acts is an issue of first impression. We are guided here by the supreme court's decision addressing a similar challenge to another provision in the definitional section of the SVP statute.
¶ 36 In In re Detention of Halgren,[44] the supreme court considered whether a unanimity instruction was required to decide whether Halgren "suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility."[45] During trial, the State provided evidence that Halgren suffered from both a mental abnormality and a personality disorder.[46] The trial court rejected Halgren's proposed unanimity instruction requiring the jury to unanimously agree whether he suffered *925 from a mental abnormality or a personality disorder.[47]
¶ 37 On appeal, Halgren argued that State v. Petrich[48] required a unanimity instruction based upon "an analogy between cases involving multiple criminal acts supporting a single charge ... and SVP cases involving multiple mental illness diagnoses."[49] The supreme court stated that a unanimous jury verdict in an SVP case is both a constitutional and a statutory right.[50] While the criminal law unanimity cases can be applicable to SVP cases, the legislative intent was to provide two distinct means of establishing the mental illness element.[51] Because there were alternative ways to establish the broader proposition that a person is an SVP, the State v. Arndt[52] alternative means test was applicable. The court explained that:
where there is a single offense committable in more than one way, "it is unnecessary to a guilty verdict that there be more than unanimity concerning guilt as to the single crime charged ... regardless of unanimity as to the means by which the crime is committed provided there is substantial evidence to support each of the means charged."[[53]]
¶ 38 Legislative intent determines whether courts should analyze a statute under this framework,[54] considering:
(1) the title of the act; (2) whether there is a readily perceivable connection between the various acts set forth; (3) whether the acts are consistent with and not repugnant to each other; and (4) whether the acts may inhere in the same transaction.[[55]]
Applying this test to the statute, the supreme court concluded that "mental abnormality" and "personality disorder" were alternative means of fulfilling the statutory requirement at issue in that case.[56]
¶ 39 As in Halgren, in order to determine legislative intent respecting a recent overt act, we first look to the title of the provision: "recent overt act." The three alternatives "act," "threat," and "combination thereof" all appear under the same definition of recent overt act at RCW 71.09.020(12). Second, there is a readily perceivable connection between these three alternatives. Each is a behavior that supports the same result proving that the respondent has committed a recent overt act. Third, they are consistent with and not repugnant to each other. A "threat" is consistent with an "act." And "any combination" of a threat or an act is, likewise, consistent with the definition's other two alternatives. Finally, the Legislature's addition of the phrase "or combination thereof" indicates that the three means may be exhibited independently of each other or in conjunction with one another. In sum, the legislative intent of the recent overt act statute is consistent with our conclusion that an alternative means analysis is appropriate.
¶ 40 As in Halgren, the acts, threats, or combinations thereof presented to the jury are statutory alternatives to determining whether there is proof of a recent overt act to show current dangerousness. A unanimity instruction was not required.
¶ 41 Aston argues that there is insufficient evidence of at least one of the alternative means.[57] We disagree. As the supreme *926 court held in Halgren, a unanimity instruction is not necessary as long as there is substantial evidence to support each alternative means.[58] That requirement is fulfilled here.
¶ 42 As described above, there is substantial evidence that Aston committed an "act." Additionally, Aston's statement to CCO Austin that "if he was given the opportunity to reoffend, he would" is substantial evidence of a "threat." Finally, CCO Austin's observation of the evidence of Aston's acts, in the form of written fantasies, and Aston's comment during the same meeting that he would reoffend if given the opportunity, constitute sufficient evidence of a "combination thereof."
¶ 43 The State argues that the alternative means analysis does not apply. It claims that the Legislature's 2009 amendment allows the State to prove "a course of conduct rather than a discreet action." This is not persuasive.
¶ 44 When engaging in statutory interpretation, the court looks first to the statute's plain language.[59] If the statute's meaning is plain on its face, the inquiry ends.[60] A statute is ambiguous when it is susceptible to two or more reasonable interpretations, but not merely because different interpretations are possible.[61] Only when the statutory language is unclear, should the court review legislative history to determine the scope and purpose of a statute.[62] The meaning of a statute is a question of law that this court reviews de novo.[63]
¶ 45 Before amendment, the definition of a recent overt act was:
any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act.[[64]]
The legislature then amended it by changing "act or threat" to "act, threat, or combination thereof" and by adding "or behaviors" to the end of the sentence, so that it reads "person engaging in the act or behaviors."[65] The amendments, on their face, and consistent with the analysis in Halgren, indicate that the State must still prove one of the three statutory alternatives.
¶ 46 Even if there was some ambiguity in the plain words of the statute, the State does not cite any legislative history in support of its argument that the amendments do not permit an alternative means analysis. Upon our independent review of the Senate Journal, the amendment passed without comment.[66] Therefore, we conclude that the State's interpretation is not persuasive.
¶ 47 The State also argues that unanimity on a particular act or threat is not required under the "means within a means" analysis described in Sease.[67] But, this case is controlled by the alternative means analysis. In Sease, the court held that the alternative means analysis was not applicable.[68] Therefore, Sease is not relevant.
¶ 48 We affirm the involuntary commitment order.
*927 ¶ 49 The balance of this opinion has no precedential value. Accordingly, under RCW 2.06.040, it shall not be published.
WE CONCUR: LAU and APPELWICK, JJ.
NOTES
[1] In re Det. of Robinson, 135 Wash.App. 772, 778, 146 P.3d 451 (2006), review denied, 161 Wash.2d 1028, 172 P.3d 360 (2007).
[2] RCW 71.09.060(1).
[3] RCW 71.09.020(12).
[4] Robinson, 135 Wash.App. at 778, 146 P.3d 451 (citing In re Pers. Restraint of Young, 122 Wash.2d 1, 31, 857 P.2d 989 (1993)).
[5] Id. (citing Young, 122 Wash.2d at 41-42, 857 P.2d 989).
[6] RCW 71.09.060(1).
[7] In re Det. of Sease, 149 Wash.App. 66, 79, 201 P.3d 1078 (citing State v. Hoisington, 123 Wash. App. 138, 147, 94 P.3d 318 (2004)), review denied, 166 Wash.2d 1029, 217 P.3d 337 (2009).
[8] Id. (citing In re Det. of Halgren, 156 Wash.2d 795, 811, 132 P.3d 714 (2006)).
[9] Report of Proceedings (September 30, 2009) at 363-64.
[10] Id. at 359-60.
[11] Id. at 370-71.
[12] Id. at 298.
[13] Id. at 316-17.
[14] Report of Proceedings (October 5, 2009) at 647-48.
[15] Instruction No. 6 stated in relevant part: "The term `recent overt act' means any act, threat or combination thereof that has either caused harm of a sexually violent nature or creates reasonable apprehension of such harm in the mind of an objective person who knows the history and mental condition of the person engaging in the act or behaviors." Clerk's Papers at 939.
[16] 153 Wash.App. 833, 223 P.3d 1241 (2009), review granted, 168 Wash.2d 1036, 233 P.3d 888 (2010).
[17] Id. at 842, 223 P.3d 1241.
[18] Id. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2382 (2002)).
[19] Report of Proceedings (September 30, 2009) at 364.
[20] 130 Wash.App. 326, 122 P.3d 942 (2005), review denied, 158 Wash.2d 1010, 143 P.3d 830 (2006).
[21] Id. at 334, 122 P.3d 942.
[22] Id. at 330, 122 P.3d 942.
[23] Id. at 332, 122 P.3d 942.
[24] Id. at 335, 122 P.3d 942.
[25] Id.
[26] Id. at 336, 122 P.3d 942.
[27] Brief of Appellant at 14.
[28] Danforth, 153 Wash.App. at 838-39, 223 P.3d 1241.
[29] Id. at 839, 223 P.3d 1241.
[30] Id. at 839-40, 223 P.3d 1241.
[31] Id. at 841, 223 P.3d 1241.
[32] Id. at 845, 223 P.3d 1241.
[33] Id. at 843, 223 P.3d 1241.
[34] Id.
[35] Id. at 846, 223 P.3d 1241.
[36] Brief of Appellant at 17.
[37] Id. at 17-18.
[38] For example, the supreme court stated in In re Det. of Anderson that ongoing sexual fantasies about children involving sexual violence could constitute an overt act. 166 Wash.2d 543, 550, 211 P.3d 994 (2009). "Anderson's sexual activities at WSH could constitute overt acts.... Anderson also had ongoing sexual fantasies of children involving sexual violence. Dr. Phenix and other specialists who were familiar with Anderson's history and mental condition concluded in light of these factors that he posed a clear risk to reoffend if released from custody. Those expert opinions support a reasonable apprehension of sexually violent harm, and therefore by definition, Anderson's sexual activities could constitute overt acts." Id.
[39] State v. Petrich, 101 Wash.2d 566, 683 P.2d 173 (1984).
[40] State's Corrected Response Brief at 19-22.
[41] 149 Wash.App. 66, 201 P.3d 1078, review denied, 166 Wash.2d 1029, 217 P.3d 337 (2009); State's Corrected Response Brief at 22-24.
[42] Stiley v. Block, 130 Wash.2d 486, 498, 925 P.2d 194 (1996).
[43] Boeing v. Harker-Lott, 93 Wash.App. 181, 186, 968 P.2d 14 (1998).
[44] 156 Wash.2d 795, 132 P.3d 714 (2006).
[45] Former RCW 71.09.020(16) (2006) (emphasis added).
[46] Halgren, 156 Wash.2d at 800-01, 132 P.3d 714.
[47] Id. at 807, 132 P.3d 714 (emphasis added).
[48] 101 Wash.2d 566, 683 P.2d 173 (1984).
[49] Halgren, 156 Wash.2d at 808, 132 P.3d 714.
[50] Id. at 807-08, 132 P.3d 714.
[51] Id. at 809, 811, 132 P.3d 714.
[52] 87 Wash.2d 374, 553 P.2d 1328 (1976).
[53] Halgren, 156 Wash.2d at 809, 132 P.3d 714 (quoting Arndt, 87 Wash.2d at 377, 553 P.2d 1328).
[54] Id. (citing Arndt, 87 Wash.2d at 378, 553 P.2d 1328).
[55] State v. Berlin, 133 Wash.2d 541, 553, 947 P.2d 700 (1997) (citing Arndt, 87 Wash.2d at 379, 553 P.2d 1328).
[56] Halgren, 156 Wash.2d at 811, 132 P.3d 714.
[57] Reply Brief of Appellant at 9-10.
[58] Halgren, 156 Wash.2d at 809, 132 P.3d 714 (citing Arndt, 87 Wash.2d at 377, 553 P.2d 1328).
[59] State v. Armendariz, 160 Wash.2d 106, 110, 156 P.3d 201 (2007).
[60] Id. at 110, 156 P.3d 201.
[61] Id.; Burton v. Lehman, 153 Wash.2d 416, 423, 103 P.3d 1230 (2005).
[62] Wash. Fed'n of State Employees v. State, 98 Wash.2d 677, 684-85, 658 P.2d 634 (1983).
[63] Okeson v. City of Seattle, 150 Wash.2d 540, 548-49, 78 P.3d 1279 (2003).
[64] Former RCW 71.09.020(12) (2006) (emphasis added).
[65] Laws of 2009, ch. 409, § 1 (emphasis added).
[66] See SENATE JOURNAL, 61st Leg., Reg. Sess., at 147, 404, 612, 1766, 1773, 1870, 1950 (Wash. 2009).
[67] See Sease, 149 Wash.App. at 77-79, 201 P.3d 1078.
[68] Id. at 77, 201 P.3d 1078.