IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81024-3-I |
| Respondent, | |
| | DIVISION ONE |
| v. | |
| | UNPUBLISHED OPINION |
| CHAZ ROBERT BUTLER, | |
| Appellant. | |

ANDRUS, A.C.J. — Chaz Butler challenges his convictions for third degree assault, arguing the two victims, employed by a private security company to provide security services to Sound Transit and King County Metro, were not employed by a "transit company" or a "contracted transit service provider" as required by RCW 9A.36.031(1)(b). He further contends the court erred in declining to instruct the jury on cross-racial eyewitness identification. Finally, he argues the prosecutor committed prosecutorial misconduct during closing arguments. We affirm his convictions.

## FACTS

On November 2, 2018, Michael Bilodeau was employed by a private security firm, Securitas, and was working as a transit security officer in the light rail

Beacon Hill station. Bilodeau, wearing a uniform emblazoned with the words "Transit Security" and "Security Sound Transit," was dispatched to investigate someone skateboarding on the train platform. When he arrived at the platform, he heard the skateboard and followed the sound until he saw a man doing skateboard tricks near the elevators.

Bilodeau described the skateboarder as a black man, over six feet tall, weighing approximately 200 pounds, with facial hair. The man wore an orange hooded sweatshirt, shorts, and a backpack, and one of his shoes had duct tape on the side. Bilodeau informed Butler that it was not safe to skateboard on the platform and asked him to stop. Butler responded, "F— you," so Bilodeau asked him to leave. When Butler just stood there, apparently unwilling to leave the platform, Bilodeau reiterated that he was not allowed to skateboard on the platform. They "went back and forth" like this until a nearby bystander angered Butler by calling him a jackass. Butler retorted "I'll kick your ass, old man." Bilodeau intervened, telling Butler "it's not worth it. Just leave. Just leave on the next elevator."

At that point, Butler lunged and struck Bilodeau repeatedly in the face with a closed fist until Bilodeau fell against the wall. Butler struck Bilodeau hard enough to cause his vision to black out and to knock his hat and glasses off. Bilodeau testified that the attack was very painful and caused him to feel "dizzy and dazed."

Bilodeau quickly collected his hat and glasses and radioed for help. Butler got into an elevator and left.

On November 3, 2018, one day after this incident, another transit security officer, Kurtis Mays, was assaulted while standing on the platform of the Pioneer Square station. At the time, he wore a bright yellow uniform with the word "Security" on the back. This jacket was consistent with the uniform worn by King County Metro Transit security officers.

In security video footage, Mays can be seen speaking with a man carrying a skateboard. The man struck Mays in the face, knocking him to the floor. Responding officers could see that Mays' face was swollen from the attack and his bottom denture had been broken in half.

Detective Ross Markham reviewed security video footage from both incidents and quickly noticed similarities between the events. The assailants appeared to be the same person—they had the same physical characteristics, including the same build, height, weight, and facial hair, and they possessed similar items, including a taped-up shoe, a skateboard with distinctive stickers, and a backpack. And both assailants punched using their left hand. Detective Markham distributed still shots from the videos to other officers to help identify the assailant.

Detective Markham initially suspected a man named Michael Ross. He created a photo montage of six African-American men, including Ross, in the montage to show to Bilodeau. But Bilodeau indicated that none of the men in the montage was the assailant. Butler was not pictured in this photo montage.

On November 10, 2018, Sergeant David Hoag spotted a man on Capitol Hill who looked like the transit station assailant. Both were black, over six feet tall,

weighed approximately 210 pounds, and had close-cropped hair and facial hair. Both wore black shoes and the left shoe was duct-taped along the outer edge. Sergeant Hoag testified that the man he observed on Capitol Hill carried a similar, military-style backpack and a skateboard with the same pattern of stickers affixed to the bottom of the deck. Sergeant Hoag stopped the man, identified him as Butler from his driver's license, and arrested him.

The State charged Butler with two counts of third degree assault for the attacks on Bilodeau and Mays. Bilodeau testified and identified Butler as his assailant. Mays did not testify and police were unable to locate him after the assault to determine if he could identify Butler as the man who assaulted him. The jury convicted Butler as charged, and Butler was sentenced to 182 days imprisonment.

ANALYSIS

A. Sufficiency of the Evidence

Butler was charged with two counts of assault in the third degree under RCW 9A.36.031(1)(b). Under that statute, the State had to prove that Butler assaulted "a person employed as . . . a security officer, by a public or private transit company or a contracted transit service provider, while that person is performing his or her official duties at the time of the assault." Butler asks us to reverse his convictions because the two security guards were not employed by either a "transit company" or a "contracted transit service provider" as required by RCW 9A.36.031(1)(b).

We review issues of statutory interpretation de novo. State v. Dennis, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). The purpose of statutory interpretation is to give effect to the intent of the legislature. State v. Sweany, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). To derive legislative intent, we look to the "plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." State v. Evans, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). If the statute's meaning is unambiguous, our inquiry ends. State v. Armendariz, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). A statute is ambiguous when it is susceptible to two or more reasonable interpretations, but not merely because different interpretations are possible. In re Det. of Aston, 161 Wn. App. 824, 842, 251 P.3d 917 (2011).

It is undisputed that Bilodeau and Mays were employed by Securitas, a private security company that contracts with Sound Transit and King County Metro Transit to provide security officers at various transit stations. At issue in this appeal is whether transit security officers, whether employed directly by Sound Transit or King County Metro, or employed by a company contracting with these agencies to provide transit security, are included in the protections of RCW 9A.36.031(1)(b). We conclude they are.

The statute explicitly criminalizes assault on persons employed as "a transit operator or driver, the immediate supervisor of a transit operator or driver, a mechanic, or a security officer." RCW 9A.36.031(1)(b) (emphasis added). There is no dispute that Bilodeau and Mays were so employed. But the statute covers

security officers only if they are employed <u>by</u> "a public or private transit company or a contracted transit service provider." RCW 9A.36.031(1)(b).

Sound Transit and King County Metro fall within the scope of the employers covered by the statute because these agencies are public transit companies. But Bilodeau and Mays were not employed by either agency. And both parties agree that Securitas is not a "private transit company" because it is not in the business of operating trains, buses, or any other form of transit.

The only question here is whether the security guards Butler assaulted were employed by a "contracted transit service provider." While this phrase could mean an entity under contract to provide the actual transit services, such as the operation of the trains or buses, the phrase could also mean an entity under contract to provide any service to a transit company. Butler asks us to adopt the first of these two interpretations. We decline to do so.

First, Butler's narrow reading ignores the fact that the legislature separated the phrase "a private transit company" and "a contracted transit service provider" with the word "or." When the legislature uses the term "or," we presume it is being used in the disjunctive sense unless the legislative intent is clearly to the contrary. <u>Childers v. Childers</u>, 89 Wn.2d 592, 595-96, 575 P.2d 201 (1978). And use of the disjunctive in a statute indicates alternatives. <u>See</u> <u>generally</u>, A. SCALIA & B. GARNER, READING THE LAW: THE INTERPRETATION OF LEGAL TEXTS, Conjunctive/Disjunctive Canon, 116 (2012). Thus, under rules of statutory construction, a transit company—the entity actually operating the trains and buses—is distinct from a contracted transit service provider; the two are not

intended to be the same. We cannot conclude that a "contracted transit service provider" means an entity operating the trains and buses because such an interpretation would collapse the two statutory alternatives into one, ignoring the legislature's use of the disjunctive. The phrase "contracted transit service provider" must mean something other than a "transit company."

Second, Butler's interpretation of RCW 9A.36.031(1)(b) would lead to an absurd result. It would make a defendant's level of culpability for assaulting a security officer on a transit platform or in a transit tunnel dependent on who signs the victim's paycheck, rather than on the victim's work duties. Common sense informs our analysis and we will avoid absurd results in statutory interpretation. State v. Alvarado, 164 Wn.2d 556, 562, 192 P.3d 345 (2008). We therefore conclude the legislature intended to make it a felony to assault a security officer working within a transit system, whether employed by the actual operator of that system or employed by an independent contractor.

Because Butler's interpretation of RCW 9A.36.031(1)(b) is not supported textually and would lead to absurd results, we reject it. Securitas, under contract to Sound Transit and King County Metro to provide security services in their transit facilities, is a contracted transit service provider. Substantial evidence thus supports Butler's assault in the third degree convictions.

B. Cross-Racial Jury Instruction

Butler next argues the trial court erred in denying his proposed instruction on cross-racial eyewitness identification. Because Butler is African American and Bilodeau appeared to be white, Butler argues he was entitled to this instruction.

We review a trial court's choice of jury instructions for an abuse of discretion. State v. Hathaway, 161 Wn. App. 634, 647, 251 P.3d 253 (2011). "[I]t is not error for a trial court to refuse a specific instruction when a more general instruction adequately explains the law and allows each party to argue its case theory." Id. at 647. We similarly review a trial court's rejection of a cross-racial eyewitness identification instruction for abuse of discretion. State v. Allen, 176 Wn.2d 611, 624-26, 294 P.3d 679 (2013).

Butler proposed Washington Pattern Jury Instruction (WPIC) 6.52, which states:

> Eyewitness testimony has been received in this trial on the subject of the identity of the perpetrator of the crime charged. In determining the weight to be given to eyewitness identification testimony, in addition to the factors already given you for evaluating any witness's testimony, you may consider other factors that bear on the accuracy of the identification. These may include:
>
> • The witness's capacity for observation, recall and identification;
>
> • The opportunity of the witness to observe the alleged criminal act and the perpetrator of that act;
>
> • The emotional state of the witness at the time of the observation;
>
> • The witness's ability, following the observation, to provide a description of the perpetrator of the act;
>
> • [The witness's familiarity or lack of familiarity with people of the perceived race or ethnicity of the perpetrator of the act;]
>
> • The period of time between the alleged criminal act and the witness's identification;
>
> • The extent to which any outside influences or circumstances may have affected the witness's impressions or recollection; and
>
> • Any other factor relevant to this question.

No. 81024-3-I/9

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 6.52, at 218 (5th ed. 2021) (WPIC).

The trial court agreed to give this instruction but redacted the bracketed language in the fifth bullet point of WPIC 6.52 because there was no expert testimony to support it and no evidence that Bilodeau, the only person who provided an eyewitness identification, lacked a familiarity with people of different races or ethnicities.

We see no abuse of discretion here. First, the pattern instruction gives the trial court the discretion to determine whether the instruction is warranted. Our Supreme Court has recognized concerns about the reliability of cross-racial identifications in criminal cases. Allen, 176 Wn.2d at 617. But the WPI Committee also expressed concerns that this type of instruction could constitute an impermissible comment on the evidence. See WPIC 6.52, cmt at 219. The WPI Committee thus endeavored to develop language to avoid this constitutional problem, and chose to put the cross-racial language in brackets, cautioning courts to carefully review Allen before determining whether the factor should be included in any instruction given to the jury.[1] The trial court correctly concluded that the language relating to cross-racial identification may or may not be appropriate, depending on the evidence presented at trial.

Second, the trial court was also correct in concluding there was a lack of evidence to support the bracketed language of WPIC 6.52. There is no requirement that the State or defense present expert testimony on the fallibility of

_____

[1] When a pattern instruction includes bracketed language, it signifies "that the enclosed language may or may not be appropriate for a particular case." WPIC 0.10 at 6.

cross-racial identification before the bracketed language in WPIC 6.52 would be appropriate. The WPI Committee noted that the instruction may be used, whether or not expert testimony has been presented. WPIC 6.52, Notes on Use at 218-19. But there was no evidence, lay or expert, regarding either the fallibility of cross-racial identification in general or Bilodeau's familiarity or lack of familiarity with people who share Butler's race.

Finally, Butler was able to present evidence and argue to the jury that Bilodeau had misidentified him as the assailant. Butler cross-examined Bilodeau extensively about his ability to observe his assailant's face at the time of the assault and the time delay between the assault and his in-court identification. In closing, Butler argued that Bilodeau's in-court identification was unreliable because his encounter with the assailant was so brief, it left Bilodeau dazed, it led him to lose vision during the encounter, and the identification occurred some 14 months after the assault. Butler also highlighted the fact that the perpetrator's facial features were obscured by his sunglasses and hood and Bilodeau did not see the facial features of his assailant. Butler even argued that Butler's identification may have been infected by implicit and explicit biases towards African Americans.

While the court could have left the cross-racial identification language in WPIC 6.52 in its instructions to the jury, its decision to delete it was not an abuse of discretion under the circumstances of this case.

C. Prosecutorial Misconduct

Finally, Butler argues that, during closing arguments, the prosecutor committed misconduct when he made a burden-shifting argument designed to

appeal to the racial prejudices of the jury. We agree that the prosecutor's comments were improper, but we disagree that they appealed to racial prejudice. Moreover, the trial court sustained Butler's objections and instructed the jury to disregard them. He therefore cannot establish prejudice.

To establish prosecutorial misconduct during closing argument, a defendant must show that the prosecuting attorney's statements were both improper and prejudicial. State v. Allen, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). We consider the prosecutor's conduct in the context of the record and all the circumstances at trial. State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). The prosecution commits misconduct by misstating or shifting its burden to prove the defendant's guilt beyond a reasonable doubt. State v. Lindsay, 180 Wn.2d 423, 434, 326 P.3d 125 (2014). But a defendant suffers prejudice from this misconduct only where there is a substantial likelihood that it affected the jury's verdict. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012).

During closing argument, the prosecutor reminded the jury that Butler was entitled to a presumption of innocence. He reiterated that the State had the burden of proving Butler's guilt beyond a reasonable doubt. He then went on to say "But what I want to ask you about may be a subconscious bias you might have. Why does this matter?" Defense objected. When the court overruled the objection, the prosecutor continued, "Why does this matter? Are these men worthy of the same protection of the law as Mr. Butler is?" Again, defense counsel objected, arguing the comments were improper. The court sustained this objection and explained to the jury that the State was required to prove its case beyond a reasonable doubt.

The prosecutor returned again to this line of argument and said "I want to ask you if you have a subconscious bias that maybe these men are not worthy." Defense counsel objected for a third time. The court sustained the objection and struck the argument from the record. The court explained during a sidebar conference that the way in which the prosecutor phrased his comment "felt like burden shifting to me. It felt like telling the jury that rather than focusing on whether the State proved its case beyond a reasonable doubt and overcame the presumption of innocence, he was asking the jurors to turn to what would be the best outcome or the most desirable outcome for the victims which is never the inquiry that the jury is supposed to engage in."

Butler argues the prosecutor's comments did, as the trial court concluded, lessen the State's burden to proof. While we agree that the jury could have drawn an improper inference from the prosecutor's comments, Butler has not demonstrated that the comments had a substantial likelihood of affecting the jury's verdict. Prejudice resulting from a prosecutor's improper remarks can be remedied by a curative instruction from the trial court. See State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008) (trial court instruction on reasonable doubt cured prejudice resulting from the prosecutor's improper argument that the jury was not required to give the defendant the "benefit of the doubt.").

Here, the trial court sustained Butler's objection to the prosecutor's improper argument and struck it from the record. The jury was instructed that "If evidence was not admitted or was stricken from the record, then you are not to consider it in reaching your verdict(s)." The jury is presumed to follow the court's instructions to

disregard closing remarks. State v. Swan, 114 Wn.2d 613, 661-62, 790 P.2d 610 (1990). Any potential prejudice was cured.

Butler contends he does not need to prove prejudice because there were racial undertones to the prosecutor's statements and the statements were designed to appeal to the passions and prejudices of the jury. Relying on State v. Monday, 171 Wn.2d 667, 257 P.3d 551 (2011), he argues we should presume prejudice and require the State to prove that the error was harmless beyond a reasonable doubt. But the prosecutor's comments here are in no way analogous to the comments the Supreme Court addressed in Monday.

In Monday, a prosecutor made repeated overt derogatory comments to reinforce racial stereotypes. Our Supreme Court reversed Monday's conviction, holding that "when a prosecutor flagrantly or apparently intentionally appeals to racial bias in a way that undermines the defendant's credibility or the presumption of innocence, we will vacate the conviction unless it appears beyond a reasonable doubt that the misconduct did not affect the jury's verdict." Id. at 680.

Monday is distinguishable. Here, there is no basis for arguing the prosecutor deliberately appealed to the jury's racial bias. The trial court made it clear that it did not believe the prosecutor was intentionally trying to shift the burden of proof to Butler. The prosecutor referred to a "subconscious bias" jurors might have against security officers, not against persons of color. There were no comments reflecting racial stereotypes. And neither Butler nor the court suggested the prosecutor's comments were racially motivated. Because the record does not support the argument that the prosecutor was trying to appeal to racial bias, the

constitutional harmless error standard does not apply. <u>See</u> <u>State v. Emery</u>, 174 Wn.2d 741, 757-59, 278 P.3d 653 (2012) (constitutional harmless error review does not apply where a prosecutor misstates the burden of proof but there is no deliberate injection of racial bias.).

We therefore affirm.

_Andrus, A.C.J._

WE CONCUR:

_Coburn, J._        _Appelwick, J._