[No. 84152-7.   En Banc.]
Argued February 8, 2011.     Decided November 10, 2011.

*In the Matter of the Detention of* ROBERT
DANFORTH, *Petitioner.*

60

*Lila J. Silverstein* (of *Washington Appellate Project*), for petitioner.

*Daniel T. Satterberg, Prosecuting Attorney,* and *David J.W. Hackett, Deputy,* for respondent.

¶1 J.M. JOHNSON, J. — In October 2006, Robert Danforth went to the King County Sheriff's Office, described his history of sex offenses, and made explicit descriptions of his plans to molest boys and to have intercourse with a child. He repeatedly said that he would act on his plan if he was not committed as a sex offender.

¶2 Under the authority of former RCW 71.09.030(5) (1995), the King County prosecuting attorney filed a petition to civilly commit Danforth as a sexually violent predator. Danforth moved for summary judgment, arguing that his actions did not constitute a "recent overt act" to qualify him for commitment proceedings under former RCW 71.09-.020(10) (2006), *recodified as* RCW 71.09.020(12). He also

argued that chapter 71.09 RCW was unconstitutionally vague as applied to him. The trial court denied his motion for summary judgment. The Court of Appeals affirmed. *In re Det. of Danforth*, 153 Wn. App. 833, 223 P.3d 1241 (2009). Danforth petitioned this court for discretionary review, which was granted. *In re Det. of Danforth*, 168 Wn.2d 1036 (2010). We affirm the Court of Appeals.

FACTS AND PROCEDURAL HISTORY

1. *Danforth's History of Sex Offenses*

¶3 Danforth has a long record of criminal behavior and sex offenses. In 1970, he was arrested for sexually abusing four boys between the ages of 7 and 13. Representative of his abuse of the other boys, Danforth put one boy on a bed, moved on top of him, kissed him, touched the boy's private area, and rubbed the boy's arm against Danforth's private area. Danforth was prosecuted for these offenses, but the case was dismissed for a speedy trial violation.

¶4 In 1971, Danforth approached a group of young boys at a ballpark and asked them if they wanted to have " 'sex play.' " *Danforth*, 153 Wn. App. at 837. Danforth was convicted of indecent liberties for this incident. The court ordered that he be sent for treatment at Western State Hospital. After a short time at Western State Hospital, Danforth was found to be not amenable to treatment and was sent to prison.

¶5 In August 1987, Danforth asked a 16-year-old boy and his friend to participate in sexual activity. For this incident, he was charged and convicted of two counts of communication with a minor for immoral purposes. The Court of Appeals later reversed the convictions because it held that former RCW 9.68A.090 (1986) was unconstitutionally vague.[1] This

---

[1] *State v. Danforth*, 56 Wn. App. 133, 782 P.2d 1091 (1989), *overruled by State v. McNallie*, 120 Wn.2d 925, 933, 846 P.2d 1358 (1993). Former RCW 9.68A.090(1) stated:

A person who communicates with a minor for immoral purposes is guilty of a gross misdemeanor, unless that person has previously been convicted under

court overruled that holding in *State v. McNallie*, 120 Wn.2d 925, 933, 846 P.2d 1358 (1993) and affirmed the constitutionality of the statute.

¶6 Finally, in the summer of 1987, Danforth hit a 12-year-old boy over the head with a rock, forcibly pulled down the boy's pants, and anally raped him, leaving the boy crying behind a theatre. For this, Danforth was convicted of second degree rape and served prison time. He was released in 1996.

### 2. *Danforth's Admissions to the King County Sheriff*

¶7 On October 25, 2006, Danforth went to the King County Sheriff's Office and asked to speak to a detective. He told the detective that he had come to "turn himself in" because he "[felt] like re-offending." Clerk's Papers (CP) at 66. Danforth then told the detective that he was sexually interested in young boys. Danforth said he needed to be in a facility permanently and told the detective that his desire was "dangerous." *Id.* The detective called mental health professionals (MHPs) to interview Danforth.

¶8 Danforth explained to the MHPs that he "desires, needs, wants to have sex with children." *Id.* He told them, "I have impulses that I want to [have sex with children]. If I'm not locked up – I could reoffend." *Id.* at 66-67. Among other statements, Danforth said that he would walk to a bus stop with young boys (or wait for young boys to arrive) and then try to have sex with them. He also said he would go to a specific video arcade, find a boy playing a video game, and rub against the boy, saying, "[I]f they like it I might pursue more." *Id.* at 67. The detective advised Danforth of his *Miranda*[2] rights and booked him into the King County jail. Danforth thanked him and stated that he understood his rights.

---

this section or of a felony sexual offense under chapter 9.68A, 9A.44, or 9A.64 RCW or of any other felony sexual offense in this or any other state, in which case the person is guilty of a class C felony punishable under chapter 9A.20 RCW.

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

¶9 The next day, a detective took a recorded statement from Danforth.[3] Danforth reiterated his prior statements and asked to be committed as a sex offender. After explicitly describing how he would have sexual intercourse with a young boy, Danforth said, "I feel I'd be a serious danger to society if I was turned loose" and, "[I]f it wasn't for the police that I can turn to, I'm about ready to offend." *Id.* at 398, 400, 406. The detective and Danforth also discussed his history of sex offenses.

### 3. *The Petition to Civilly Commit Danforth*

¶10 The State filed a petition to civilly commit Danforth as a sexually violent predator under former RCW 71.09-.030(5) on October 26, 2006. The petition was supported by a declaration from licensed psychologist Dr. Charles A. Lund, who stated, " 'Danforth made explicit and specific statements of intent to commit sexual offenses against young boys. . . . The specificity of the threat is[,] professionally speaking, quite alarming and there is imminently a high risk of sexual reoffending, given the threat." *Danforth*, 153 Wn. App. at 839 (second alteration in original).

### 4. *Danforth's Motion for Summary Judgment*

¶11 Danforth filed a motion for summary judgment. He claimed that he had not committed a "recent overt act" because (1) his "threat to rub against the back of 13 to 15 year old boys, for sexual pleasure," did not "[rise] to the level of a threat of sexually violent offense that satisfies . . . 71.09.020(10)" and (2) "RCW 71.09 is unconstitutionally vague as applied [to Danforth], as speech alone is alleged as the recent overt act." CP at 61-62.

¶12 Danforth's motion also maintained that the following facts were *not* in controversy: (1) he "made the threats

---

[3] Before the statement, the detective again advised Danforth of his *Miranda* rights, and Danforth stated that he understood and that his statements were voluntary. CP at 397.

set out in the State's Petition," (2) he "went to the Sheriff's Office [and said] 'I feel like re-offending,' " (3) he said he would go to a specific video arcade and "find a boy playing a video game and rub himself against the back of them," and (4) he had said "yes [this was for his pleasure], and 'if they liked it I might pursue more.' " *Id.* at 61.

¶13 Danforth also acknowledged that Dr. Lund, who had known Danforth since at least 2002,[4] "rendered an opinion that Mr. Danforth's threat was a basis for apprehension of harm of a sexually violent nature." *Id.*; *see also* former RCW 71.09.020(10).

¶14 The trial court heard the motion for summary judgment to dismiss the petition. The motion was denied. The court indicated that it found there was "sufficient evidence to survive a motion for summary judgment based on the true threat concept as being a . . . recent overt act."[5] Tr. of Trial Proceedings (June 12, 2008) at 85. In its order, dated July 10, 2008, the court ruled that "a reasonable jury could find that [Danforth's] acts as outlined in the evidence before the court constituted a Recent Overt Act." CP at 420-21.

### 5. *Danforth Stipulates to Civil Commitment Just Before Trial*

¶15 As trial was set to begin, the State introduced a stipulation agreed to when Danforth's motion for summary judgment was denied. The stipulation reads, in pertinent part:

> The Respondent and the State enter into this Stipulation for the purpose of resolving the commitment trial currently in progress.

---

[4] CP at 324, 370; *Danforth*, 153 Wn. App. at 838.

[5] The court was evidently persuaded by the State's argument at trial that a "threat" under former RCW 71.09.020(10), if it implicates the First Amendment, encompasses only "true threats" under United States Supreme Court First Amendment jurisprudence. *E.g.*, Tr. of Trial Proceedings (June 12, 2008) at 80-85. The State now argues that Danforth incorrectly examines this case under the "true threat" doctrine. State's Resp. Br. at 19-26.

. . . .

By entering into this stipulation, respondent retains the right to appeal the Respondent's Motion for Summary Judgment argued before the trial court on June 12, 2008. If Mr. Danforth prevails on appeal, he will have the right to withdraw this stipulation.

. . . .

Respondent has committed a recent overt act as that term is defined in RCW 71.09.020, namely through statements Mr. Danforth made to the [MHPs] on October 25, 2006 [and] to the King County Sheriff on October 25, 2006 and October 26, 2006.

. . . .

The Respondent understands that if the Court accepts this Stipulation[,] commitment shall last until Respondent's condition has so changed that he no longer meets the definition of a sexually violent predator or he is conditionally released to a [less restrictive alternative] pursuant to RCW 71.09.090.

CP at 286-90. The court accepted the stipulation and found all the statutory elements necessary to commit Danforth on June 16, 2008.

### 6. *Appeal*

¶16 Danforth appealed the trial court's decision on his motion for summary judgment. He claimed that his actions did not constitute a threat under the plain meaning of former RCW 71.09.020(10).[6] The Court of Appeals disagreed, holding that when viewed in the light most favorable to the nonmoving party (the State), "the evidence is sufficient to establish that Danforth expressed an intent to inflict harm" and "[t]he trial court therefore properly denied the summary judgment motion and concluded that there was sufficient evidence to submit to the jury on the issue of

---

[6] Both parties cited to the same definition of "threat" on appeal: that it is "**a :** an expression of an intention to inflict evil, injury, or damage on another [or] **b :** expression of an intention to inflict loss or harm on another . . . ." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2382 (2002); *Danforth*, 153 Wn. App. at 842 & n.8; Appellant's Opening Br. at 17; State's Resp. Br. at 16 (citing Appellant's Opening Br. at 17).

whether he committed a recent overt act." *Danforth*, 153 Wn. App. at 842.

¶17 Danforth also argued that unless the statute's definition of "recent overt act" is limited to true threats, it is unconstitutionally overbroad because it encompasses constitutionally protected speech. He argued his statements were only conditional statements (that he would harm others if he did not receive help). The Court of Appeals held that the true threat analysis does not apply because additional proof of conduct is required to establish a recent overt act under former RCW 71.09.030(5). *Id.* at 844 ("the threats must be evaluated in the context of the offender's conduct, i.e., the offender's history and mental condition"). Therefore, the Court of Appeals reasoned, the statute does not regulate pure speech. *Id.* Alternatively, the Court of Appeals held that there was sufficient evidence to submit to the jury even under a true threat analysis. *Id.* at 844-45.

¶18 Finally, Danforth argued that the definition of "recent overt act" is unconstitutionally vague because it does not give sufficient notice that "requests for help" can amount to a "threat" that will support a petition to commit someone as a sexually violent predator. *Id.* at 845. The Court of Appeals again disagreed, holding that Danforth's actions "unquestionably fall within [the] definition" of a "recent overt act," and that he had "fail[ed] to demonstrate that reasonable minds could differ on the use of the term 'threat' in the 'recent overt act definition.' " *Id.* at 846. We affirm the Court of Appeals' opinion in its entirety.

ANALYSIS

I. Danforth's Motion for Summary Judgment Was Properly Denied

A. A "threat" under former RCW 71.09.020(10) Is an Expression of Intention To Inflict Loss or Harm on Another

¶19 The meaning of a statute is a question of law reviewed de novo. *Dep't of Ecology v. Campbell & Gwinn*,

*LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). The court's fundamental objective is to ascertain and carry out the legislature's intent. *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001). To carry out the legislature's intent, we look first to the statute's plain language. *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007). If the plain language is subject to only one interpretation, our inquiry ends because plain language does not require construction. *Id.*

¶20 The plain language of former RCW 71.09.030(5) permits a prosecuting attorney to file a petition to civilly commit an individual as a sexually violent predator if that person has previously been convicted of a sexually violent offense, has since been released from total confinement, has committed a recent overt act, and it appears that the person may be a sexually violent predator.[7] The only issue in this case is whether a jury could have found that Danforth committed a "threat" within the statutory definition of a "recent overt act." Former RCW 71.09.020(10) supplies the definition of "recent overt act":

> "Recent overt act" means any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act.

The word "threat" is not further defined. Thus, to determine its plain meaning, we may look to the dictionary. *Garrison v. Wash. State Nursing Bd.*, 87 Wn.2d 195, 196, 550 P.2d 7 (1976) ("Words in a statute should be given their ordinary meaning absent ambiguity and/or a statutory definition.").

---

[7] Former RCW 71.09.030(5) states:

When it appears that . . . a person who at any time previously has been convicted of a sexually violent offense and has since been released from total confinement and has committed a recent overt act; and it appears that the person may be a sexually violent predator, the prosecuting attorney of the county where the person was convicted or charged . . . may file a petition alleging that the person is a "sexually violent predator" and stating sufficient facts to support such allegation.

¶21 *Webster's Third New International Dictionary* 2382 (2002) defines "threat" as "**a :** an expression of an intention to inflict evil, injury, or damage on another [or] **b :** expression of an intention to inflict loss or harm on another . . . ." We adopt this definition and hold that, by including the common and ordinary meaning of the word "threat" within the definition of "recent overt act," the legislature intended to civilly commit sexually violent offenders *before* harm to another victim occurs. *See* LAWS OF 2001, ch. 286, § 4; LAWS OF 1995, ch. 216, § 1; *J.M.*, 144 Wn.2d at 480 ("If the statute's meaning is plain on its face, then courts must give effect to its plain meaning as an expression of what the Legislature intended.").

¶22 With this statute, a "recent overt act" includes both the acts and threats an offender has committed that have either caused harm of a sexually violent nature or have created a reasonable apprehension of sexually violent harm in the mind of an objective person who knows of the offender's history and mental condition. This does not mean that an offender must both act and make a threat to commit a "recent overt act." Rather, it means that an offender's threats must be evaluated in the context of the offender's conduct, history, and mental condition. Here, the statements made by Danforth at the King County Sheriff's Office must be evaluated in the context of his actions, his history, and his mental condition.

### B. A Reasonable Jury Could Find that Danforth Committed a "Threat" in the King County Sheriff's Office in 2006

¶23 We review summary judgment rulings de novo, engaging in the same inquiry as the trial court. *Harris v. Ski Park Farms, Inc.*, 120 Wn.2d 727, 737, 844 P.2d 1006 (1993); RAP 9.12. A summary judgment will be affirmed if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030

(1982). All facts and reasonable inferences are reviewed in the light most favorable to the nonmoving party. *Steinbach*, 98 Wn.2d at 437. Judgment as a matter of law is appropriate where there is no legally sufficient basis for a reasonable jury to find for a party with respect to the issue. CR 50; *see also Schmidt v. Coogan*, 162 Wn.2d 488, 493, 173 P.3d 273 (2007) (per curiam) (an order granting judgment as a matter of law should be limited to circumstances in which there is no doubt as to the proper verdict).

¶24 There are no genuine issues of material fact in this case. It is argued that Danforth's actions did *not* constitute a "threat" as a matter of law. However, considering the facts and inferences in the light most favorable to the nonmoving party (the State), there is a legally sufficient basis for a jury to find that Danforth expressed an intention to inflict loss or harm on another, and therefore, it was proper to submit to the jury the issue of whether he committed a recent overt act.[8]

¶25 Danforth explicitly described to the detective at the King County Sheriff's Office his specific plan to molest boys and to have intercourse with a child. He repeatedly said that he would act on his plan if he was not committed as a sex offender. Although Danforth characterizes his actions as a conditional "cry for help" instead of as a "threat," a difference in characterization with respect to Danforth's *motive* for approaching the sheriff's office does not change the objective nature of his actions. *Compare* Pet. for Review at 16-19, *with* State's Resp. Br. at 16-19. More importantly, that there is arguably a difference in characterization means that this is exactly the type of question we submit to juries. We surely cannot hold Danforth's statements were *not* threats as a matter of law.

---

[8] Danforth does not contest that his actions created a reasonable apprehension of sexually violent harm in the mind of the prosecutor, an objective person who knew of Danforth's history and mental condition. Appellant's Opening Br.; Pet. for Review; Suppl. Br. of Pet'r; *see also* former RCW 71.09.020(10).

## II. Former RCW 71.09.030(5) Is Constitutional

¶26 Statutes are presumed to be constitutional and the party challenging a statute's constitutionality bears the burden of proving its unconstitutionality beyond a reasonable doubt. *State v. Thorne*, 129 Wn.2d 736, 769-70, 921 P.2d 514 (1996). Additionally, wherever possible, "it is the duty of this court to construe a statute so as to uphold its constitutionality." *State v. Reyes*, 104 Wn.2d 35, 41, 700 P.2d 1155 (1985). Having interpreted "threat" to mean an expression of intention to inflict harm or loss on another under the statute's plain meaning, we hold that former RCW 71.09.030(5), as defined by former RCW 71.09.020(10), is neither overbroad nor unconstitutionally vague.

### A. Former RCW 71.09.030(5) Is Not Overbroad Because It Does Not Implicate First Amendment Concerns

¶27 Under the First Amendment, Congress "shall make no law . . . abridging the freedom of speech."[9] U.S. CONST. amend. I. A statute violates the First Amendment if it is overbroad; that is, if it prohibits a substantial amount of protected speech. *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008). Former RCW 71.09.030(5) does not implicate First Amendment concerns and therefore cannot be overbroad under the First Amendment.

¶28 Former RCW 71.09.030(5) does not implicate First Amendment concerns because it does not criminalize or regulate speech.[10] It is part of a civil commitment statute.[11]

---

[9] The First Amendment was incorporated to the states through the due process clause of the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 69 L. Ed. 1138 (1925).

[10] *See Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (holding that statutes that criminalize pure speech "must be interpreted with the commands of the First Amendment clearly in mind").

[11] The United States Supreme Court has already held that Kansas' involuntary civil commitment statute, which was patterned on chapter 71.09 RCW, is civil in

We note that criminal statutes that merely use speech to establish the elements of a crime or to prove motive or intent do not implicate First Amendment concerns. *Wisconsin v. Mitchell*, 508 U.S. 476, 113 S. Ct. 2194, 124 L. Ed. 2d 436 (1993); *State v. Halstien*, 122 Wn.2d 109, 124-25, 857 P.2d 270 (1993). This civil statute allows the State to establish a "recent overt act" in a civil matter by evaluating an offender's threats in the context of his or her conduct, history, and mental condition. As the Court of Appeals stated:

> [C]hapter 71.09 RCW does not penalize threats to reoffend in a sexually violent manner, nor does it authorize civil commitment based on such threats alone. Rather, the statute's focus is on the impact of the sex offender's conduct on the community, i.e., present dangerousness, which is established by proof of a recent overt act. This requires more than showing a threat to reoffend; the State must also show that the offender's mental condition and history create a reasonable apprehension of such harm from an objective viewpoint. Thus, because the threats must be evaluated in the context of the offender's conduct, i.e., the offender's history and mental condition, the statute does not regulate pure speech. Rather, it allows the State to establish current dangerousness with proof of a threat that would create a reasonable apprehension of harm based on the sex offender's conduct.

*Danforth*, 153 Wn. App. at 843-44 (footnote omitted).

¶29 Unlike previous cases in which we analyzed whether a criminal statute's use of the word "threat" violated the First Amendment, chapter 71.09 RCW is not a criminal statute and does not implicate the First Amendment. *E.g.*, *State v. Schaler*, 169 Wn.2d 274, 282, 236 P.3d 858 (2010) (holding that felony harassment statute proscribes only "true threats"); *State v. Kilburn*, 151 Wn.2d 36, 43, 84 P.3d 1215 (2004) (same); *J.M.*, 144 Wn.2d at 480 (same); *State v. Williams*, 144 Wn.2d 197, 208, 26 P.3d 890 (2001) (holding

nature and does not constitute punishment. *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997).

that misdemeanor harassment statute proscribes only "true threats"). We therefore need not reach a "true threat" analysis in this civil commitment.

## B.   Chapter 71.09 RCW Is Not Unconstitutionally Vague

¶30 A vagueness challenge to a statute not involving First Amendment rights is evaluated as applied to the challenger, using the facts of the particular case. *City of Spokane v. Douglass*, 115 Wn.2d 171, 182, 795 P.2d 693 (1990) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988)). The challenged law "is tested for unconstitutional vagueness by inspecting the actual conduct of the party who challenges the ordinance and not by examining hypothetical situations at the periphery of the ordinance's scope." *Id.* at 182-83. Applying these principles to the present case, Danforth must challenge that former RCW 71.09.030(5) is unconstitutionally vague as applied to him.

¶31 Thus, Danforth must show either (1) that former RCW 71.09.020(10) does not define "recent overt act" with sufficient definiteness that ordinary people can understand what conduct constitutes a "recent overt act" or (2) that former RCW 71.09.020(10) does not provide an ascertainable standard to protect against arbitrary enforcement. *See Douglass*, 115 Wn.2d at 178 (citing *Rose v. Locke*, 423 U.S. 48, 49, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975) (defining when a statute is void for vagueness under the due process clause of the Fourteenth Amendment)); *see also Boutilier v. Immigration & Naturalization Serv.*, 387 U.S. 118, 123, 87 S. Ct. 1563, 18 L. Ed. 2d 661 (1967) (void for vagueness doctrine applies to both civil and criminal statutes).

### 1.   *Former RCW 71.09.020(10) Defines "Recent Overt Act" with Sufficient Definiteness*

¶32 To determine whether a challenged ordinance is sufficiently definite, the statutory language is afforded a sensible, meaningful, and practical interpretation. *Douglass*,

115 Wn. 2d at 180. As the United States Supreme Court has said, this "does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding. The use of common experience as a glossary is necessary to meet the practical demands of legislation." *Sproles v. Binford*, 286 U.S. 374, 393, 52 S. Ct. 581, 76 L. Ed. 1167 (1932) (citations omitted). A statute is not unconstitutionally vague merely because a person cannot predict with precise certainty the exact point at which his or her actions may be classified as a recent overt act. *See City of Seattle v. Eze*, 111 Wn.2d 22, 26, 759 P.2d 366 (1988).

¶33 Here, the common and ordinary meaning of "threat" is an expression of intent to inflict loss or harm on another. This is a sensible, meaningful, and practical interpretation of the statute that is consistent with the legislature's intent to civilly commit sexually violent offenders *before* harm to another victim occurs. Former RCW 71.09.020(10) defines "recent overt act" with sufficient definiteness that ordinary people can understand what conduct amounts to a recent overt act.[12]

    2.   *Former RCW 71.09.020(10) Provides an Ascertainable Standard To Protect against Arbitrary Enforcement*

¶34 The due process clause forbids statutes that contain *no* standards and allow police officers, judges, and juries to subjectively decide what conduct the statute proscribes or what conduct will comply with a statute in any given case. *State v. Maciolek*, 101 Wn.2d 259, 267, 676 P.2d 996 (1984). The statute must instead "provide 'minimal guidelines . . . to guide law enforcement'." *Douglass*, 115 Wn.2d at 181 (alteration in original) (quoting *State v. Worrell*, 111 Wn.2d

---

[12] Again, the question we address is not whether Danforth's statements to the King County Sheriff's Office were threats, but whether a reasonable jury could find that his statements, evaluated in the context of his conduct, history, and mental condition, constituted a recent overt act.

537, 544, 761 P.2d 56 (1988)). These determinations are not made in a vacuum, but rather, the question is whether "[t]he terms are not inherently subjective *in the context in which they are used." Worrell*, 111 Wn.2d at 544 (emphasis added). Additionally, the mere fact that a statute may require some degree of subjective evaluation by a police officer to determine whether the statute applies does not mean the statute is unconstitutionally vague. *Am. Dog Owners Ass'n v. City of Yakima*, 113 Wn.2d 213, 216, 777 P.2d 1046 (1989). "Under the due process clause, the enactment is unconstitutional only if it invites an inordinate amount of police discretion." *Douglass*, 115 Wn.2d at 181.

¶35 Former RCW 71.09.020(10) requires a person to consider an offender's acts and threats *objectively* in the context of his or her history and mental condition. It also requires that the acts and threats have either caused harm of a sexually violent nature or have created a *reasonable* apprehension of such harm in the mind of an objective person who knows of the offender's history and mental condition. Former RCW 71.09.020(10) thus provides guidelines to the prosecuting attorney and attorney general, who may file petitions for civil commitment, and does not allow them to consider threats in a vacuum. Although petitioning for civil commitment under RCW 71.09.030 is discretionary, former RCW 71.09.020(10) provides an ascertainable standard to protect against arbitrary enforcement of the involuntary civil commitment statute.

¶36 Finally, we again recognize that involuntary civil commitment is a substantial curtailment of individual liberty and therefore requires a showing that the offender is presently dangerous to justify commitment. *In re Det. of Lewis*, 163 Wn.2d 188, 193, 177 P.3d 708 (2008). We have already held that proof of a "recent overt act" satisfies this inquiry. *Id.* at 194 (citing *In re Det. of Albrecht*, 147 Wn.2d 1, 8, 51 P.3d 73 (2002); *In re Pers. Restraint of Young*, 122 Wn.2d 1, 41, 857 P.2d 989 (1993); *In re Harris*, 98 Wn.2d 276, 284, 654 P.2d 109 (1982)). The consideration of acts and

threats that have either caused harm of a sexually violent nature or have created a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act is consistent with our requirement that the State show the offender is presently dangerous and comports with due process. *Cf. Lewis*, 163 Wn.2d at 203 (Sanders, J., concurring).

CONCLUSION

¶37 A reasonable jury could find that Danforth committed a threat when he gave explicit descriptions of his plans to molest boys at a bus stop and to have intercourse with a child at a mall video arcade. Danforth repeatedly said that he would act on his plan if not committed as a sex offender. Former RCW 71.09.030(5), as defined by former RCW 71.09.020(10), is not unconstitutionally overbroad or vague. Former RCW 71.09.030(5) satisfies our due process requirement that the State show an offender is presently dangerous before he or she is involuntarily committed. We affirm the summary judgment here.

MADSEN, C.J., and OWENS, J., concur.

¶38 CHAMBERS, J. (concurring in part/dissenting in part) — I completely agree with the dissent on key principles of law, but because I would hold the petitioner to his stipulation, I concur with the lead opinion in result.

¶39 The record suggests that Robert Danforth was physically and emotionally abused by his parents and suffers from a borderline developmental disability. He has a long history of inappropriate sexual contact with children, for which he has spent time both in prison and in a mental hospital. About five years after he was last released from prison, concerned that he might again commit sex crimes, Danforth went to the authorities and asked to be commit-

ted. The State obliged by filing a petition to civilly commit Danforth as a sexually violent predator. Danforth had second thoughts and defended against the sexually violent predator petition.

¶40 Our United States Supreme Court has articulated minimum constitutional requirements before a State may effectively incarcerate someone for what that person might do as opposed to what that person has done. *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). Specifically, the State may civilly deprive a person of liberty as a sexually violent predator only if the State can show the person is both mentally ill and currently dangerous. *In re Det. of Albrecht*, 147 Wn.2d 1, 7, 51 P.3d 73 (2002) (citing *Addington v. Texas*, 441 U.S. 418, 426, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)). If the State seeks to confine a person as a sexually violent predator, with the exception of those in custody when the sexually violent predator petition is filed, due process requires the State to show, at least, that the person committed a "recent overt act" in order to establish dangerousness. *Albrecht*, 147 Wn.2d at 8 (citing *In re Pers. Restraint of Young*, 122 Wn.2d 1, 41-42, 857 P.2d 989 (1993)). "Recent overt act," in our current statute, "means any act, threat, or combination thereof that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71.09.020(12).

¶41 I wholly agree with the dissent that civil commitment as a sexually violent predator is a deprivation of liberty that has significant constitutional implications and that the constitution applies. Dissent at 81. When the State proposes to deprive a person of liberty in significant part because of speech, particularly pure speech, not only is that person afforded the protection of due process but also the protections provided by the First Amendment to the United States Constitution. The lead opinion suggests otherwise

because detention as a sexually violent predator is civil rather than criminal. In my view, it is of little consequence to the constitution, the government, or the person whose liberty is in jeopardy that the mechanism of the deprivation of liberty is civil rather than criminal. I wholly agree with the dissent that before the State may deprive a person of physical liberty, perhaps for the rest of his life, as a sexually violent predator because of a threat, the threat must be a true threat. Neither due process nor the First Amendment allows less.

¶42 Whether or not a threat amounts to a true threat is by its very nature a fact intensive question that should normally be determined by the trier of fact. *E.g.*, *State v. Schaler*, 169 Wn.2d 274, 291, 236 P.3d 858 (2010); *State v. Kilburn*, 151 Wn.2d 36, 54, 84 P.3d 1215 (2004). I cannot join the dissent in concluding that the alarming statements made by Danforth when he sought help are, as a matter of law, not true threats. Similarly, I cannot join the lead opinion in essentially concluding that they were. Lead opinion at 68, 69; dissent at 88-89. A "true threat" is a " 'statement made "in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted . . . as a serious expression of intention to inflict bodily harm upon or to take the life of [another individual]." ' " *State v. Williams*, 144 Wn.2d 197, 207-08, 26 P.3d 890 (2001) (alterations in original) (quoting *State v. Knowles*, 91 Wn. App. 367, 373, 957 P.2d 797 (1998) (quoting *United States v. Khorrami*, 895 F.2d 1186, 1192 (7th Cir. 1990))). "It is enough that a reasonable speaker would foresee that the threat would be considered serious." *Schaler*, 169 Wn.2d at 283. Like the trial judge, I would leave the question to the trier of fact.

¶43 That said, because of the procedural posture of this case, I would affirm the trial court. Danforth filed a motion for summary judgment claiming that as a matter of law, his statements did not raise to the level of a threat and therefore he did not commit a recent overt act. Given Danforth's

mental condition and history, the trial court was correct in concluding that "a reasonable jury could find that [Danforth's] acts . . . constituted a Recent Overt Act" and in denying summary judgment. Clerk's Papers at 420-21. Danforth chose to stipulate to the existence of a recent overt act, pending the result of this appeal of the trial court's denial of summary judgment. Lead opinion at 65. Since the trial court properly denied summary judgment, his stipulation stands. I therefore concur in result with the lead opinion.

C. JOHNSON, J., concurs with CHAMBERS, J.

¶44 WIGGINS, J. (dissenting) — "The thought police would get him just the same. He had committed—would still have committed, even if he had never set pen to paper—the essential crime that contained all others in itself. Thought-crime, they called it. Thoughtcrime was not a thing that could be concealed forever. You might dodge successfully for a while, even for years, but sooner or later they were bound to get you." George Orwell, *1984*, ch. 1.

¶45 The commitment and confinement of Robert Danforth as a sexually violent predator are reminiscent of Orwell's "Thoughtcrime." Fearing that he might commit a sexually violent crime, Danforth presented himself to the sheriff's office and asked to be locked up. The State filed a petition to confine Danforth as a sexually violent predator, not because he had committed a sexually violent act, but because he had allegedly threatened such an act. Danforth's statements were not a "threat" because he never expressed any intent to commit a sexually violent act, but sought help to prevent himself from committing an act. Without a recent overt act or a threat, the State cannot petition to commit a person as a sexually violent predator. Accordingly, I dissent.

## FACTS

¶46 Robert Danforth, a 64-year-old, mildly retarded blind man, has, with the exception of a misdemeanor conviction for telephone harassment in 2002, lived crime-free in his community since 1996. He has a distant history of sex crimes, including indecent liberties in 1972. On August 5, 1987, Danforth went to the Issaquah police station and "reported that he wanted to confess to anything that the officer would write up so he would be incarcerated." Clerk's Papers (CP) at 36. He was convicted of second degree rape in 1993. Following his release in 1996, Danforth lived in his own home in the community.

¶47 In 2001, Danforth unsuccessfully attempted to commit himself to a psychiatric facility. Six months later in March 2002, Danforth called the King County prosecutor's office and asked to be civilly committed. He told the prosecutor and the State's psychologist, Dr. Lund, that he felt he was a danger, lacked control, and was afraid of victimizing someone if not committed. Lund noted that Danforth "functioned adequately in the community for a substantial period of time following his release from prison, and it would appear that he could function adequately again in the community with increased social and mental health supports, including provisions for *short term* psychiatric hospitalization at times he is in crises." CP at 324 (emphasis added). Lund concluded that "the additional information about his functioning over the past year and his mental status at the time of [their] conversation would suggest that the act of requesting to be committed under chapter 71.09 RCW in and of itself does not create a reasonable apprehension of harm of a sexually violent nature." *Id.* Despite Danforth's pleas for help, there is no evidence in this record that the prosecutor's office assisted him in obtaining short-term psychiatric hospitalization or voluntary inpatient treatment.

¶48 Danforth suffers some degree of ridicule and harassment. He reports that he had been verbally harassed two to three times a month and people would threaten to burn his house down. In early October 2006, Danforth's house was pelted with raw eggs and someone placed a bag containing feces on his doorstep, lit the bag on fire, knocked on his door, and ran away. On October 25, Danforth sought asylum from this harassment at the sheriff's office at the Kent Regional Justice Center. Danforth told the detective that he had a bad dream and twice stated that he *"feared* that he was going to re-offend." CP at 391, 394 (emphasis added). "Danforth said that he *fears* that he would walk to a bus stop with boys and try to have sex." *Id.* (emphasis added).

¶49 Two mental health professionals (MHPs) spoke with Danforth, who stated that "he *fears* for the safety of a minor child." CP at 393 (emphasis added). When asked about his dream, Danforth said that "it was a red light for him" and, "I have impulses that I want to do it, if not locked up, I could re-offend." *Id.* He also asserted that "he's fighting his best to *not* re-offend." *Id.* (emphasis added). Danforth further stated that "he *thought* of going by a school, but did *not* want to, for he did not trust himself." *Id.* (emphasis added). He told the MHPs that "he nearly went to Southcenter [Mall] to the arcade but came here for help instead." CP at 413. The MHPs concluded that they could not admit him for a 72-hour mental health evaluation because they did not have probable cause to believe he was mentally ill. Nevertheless, these same statements were used to civilly commit Danforth as a "sexually violent predator" for life.

¶50 The following day, Danforth gave a recorded statement to the same detective. After describing the events in his *dream*, Danforth stated, "I gotta turn myself in to the police 'cause if I don't that's where I'm gonna be goin' – to the Southcenter Mall." CP at 398. He further stated that "I *feel* I'd be a serious danger to society if I was turned loose. *Someone please help me.*" *Id.* (emphasis added).

¶51 The parties stipulated to the record and thus there is no dispute as to the content of Danforth's statements. We

must decide whether, as a matter of law, those statements constitute a "threat" for purposes of the "recent overt act" requirement of the sexually violent predator act (SVPA), chapter 71.09 RCW.[13]

## ANALYSIS

¶52 " '[C]ommitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." ' " *In re Det. of D.F.F.*, 172 Wn.2d 37, 40 n.2, 256 P.3d 357 (2011) (alteration in original) (quoting *In re Application of Gault*, 387 U.S. 1, 50, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967)). A law that abridges a fundamental right such as liberty comports with due process only if it furthers a compelling government interest and is narrowly tailored to further that interest. U.S. CONST. amend. XIV; *In re Det. of Albrecht*, 147 Wn.2d 1, 7, 51 P.3d 73 (2002).

¶53 The history of the SVPA informs our interpretation. As originally enacted, there was no requirement of a recent overt act or threat. *In re Pers. Restraint of Young*, 122 Wn.2d 1, 41-42, 857 P.2d 989 (1993). We held in *Young* that before the State can civilly commit sex offenders, due process requires that the offender must be found to be both mentally ill and dangerous. *Id.* at 27. For an offender who is not currently in custody, due process requires that dangerousness must be established by a recent overt act. *Id.* at 41-42.

¶54 The legislature added the requirement of proof of a recent overt act in 1995, but the statute required an act, not simply a threat. LAWS OF 1995, ch. 216, § 1 ("(5) 'Recent overt act' means any act that has either caused harm of a sexually violent nature or creates a reasonable apprehen-

---

[13] The majority asserts that "the question we address is not whether Danforth's statements to the King County Sheriff's Office were threats, but whether a reasonable jury could find that his statements, evaluated in the context of his conduct, history, and mental condition, constituted a recent overt act." Majority at 73 n.12. This analysis completely ignores the statutory requirements of former RCW 71.09.020(10) (2006). A recent overt act must either be an act or a threat. Because there was no "act," we must evaluate whether Danforth's statements were threats. Former RCW 71.09.020(10).

sion of such harm."). In 2001, the legislature added "threat" as a means of proving a recent overt act. LAWS OF 2001, ch. 286, § 4(5). The definition of "recent overt act," former RCW 71.09.020(10) (2006), *recodified as* RCW 71.09.020(12), now defines a "recent overt act" as "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act."

¶55 Danforth's ability to control his behavior is thus not only relevant, it is dispositive; current dangerousness is the foundation of sexually violent predator commitment. *See In re Det. of Henrickson*, 140 Wn.2d 686, 692, 2 P.3d 473 (2000) ("The Washington sexually violent predator statute is premised on a finding of the present dangerousness of those subject to commitment."); *Foucha v. Louisiana*, 504 U.S. 71, 78, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (requiring the dual predicates of current mental illness and current dangerousness). Only if Danforth is currently dangerous does civil commitment satisfy due process.

¶56 We need analyze only "threat" here since Danforth did not perform any "acts." Furthermore, only if his statements were actual threats do we need to address whether they created a reasonable apprehension of harm.

## Danforth's Requests for Help Were Not a Threat

¶57 "Threat" is not defined in the statute; the lead opinion appropriately approved the dictionary definition of "threat" as an " 'expression of an intention to inflict loss or harm on another . . . .' " Lead opinion at 68 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2382 (2002)). But the lead opinion's search for a definition stops too soon. In order to find a threat, Danforth's statements must express an objective intention to cause harm to another. "Intent" or "intention" is not defined in the statute. The dictionary definition of "intent" is "the design or purpose to commit any wrongful or criminal act that is the natural and

probable consequence of other voluntary acts or conduct." WEBSTER'S, *supra*, at 1176; *see also* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 13.2 n.4 (2006) (citing *Restatement (Second) of Torts* § 8A (1965)). Intent requires proof that one acts with a purpose to achieve the result of his act. 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.01 (3d ed. 2008); RCW 9A.08.010(1)(a) ("A person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime.").

¶58 Putting these concepts together, Danforth perpetrated a recent overt act if he expressed the objective or purpose to cause harm (i.e., threatened) of a sexually violent nature in a manner that would create a reasonable apprehension of such harm in the mind of an objective person who knows of his history and mental condition. What is glaringly absent in this case is the slightest evidence that Danforth ever harbored the objective or purpose to perpetrate any sexually violent act. His plea for assistance is the antithesis of a threat. Danforth's statements were not threats under the plain meaning of the word because he specifically intended *not* to harm anyone. He sought help in order to avoid harming others. The State's own MHPs would not even commit Danforth to a 72-hour psychiatric hold, finding that Danforth "does not have current [symptoms] of a mental disorder that would allow psychiatric civil commitment." CP at 415.

¶59 In interpreting the SVPA, we must remember that the predicate for proceeding with a petition and for immediately confining the defendant is not a criminal act, but a recent overt act, even a threatened action. When the State relies on a threat to prove a recent overt act, construction of the SVPA requires us to construe the threat narrowly and consistently with the definition of a "threat," i.e., the expressed purpose or objective of causing harm or injury of a sexually violent nature. Under this narrow construction, I

cannot agree that Danforth threatened sexually violent harm; to the contrary, he sought to avoid perpetrating harm or injury. Because Danforth's stated intention was to prevent harm, not cause it, his statements do not constitute a threat within the plain meaning of the statute.

¶60 The lead opinion mischaracterizes the facts when it states that Danforth "described to the detective at the King County Sheriff's Office his specific plan to molest boys and have intercourse with a child." Lead opinion at 69. The detective's report states in relevant part:

> Danforth explained to [the MHPs] that he needed to be committed. He explained that he has "desires, needs, wants to have sex with children." He told them that if he leaves today that he would re-offend. He explained that he'd come in today because he feared for the safety of a minor child.

CP at 66. When asked by the detective what he would do if the sheriff's office and the MHPs could not help him, Danforth said, "[H]e'd walk to a bus stop with some boys at it or wait for some boys and then try to have sex with them." CP at 67. Danforth added that he would go to a video arcade and "rub himself" against a boy playing a video game. *Id.* None of these statements rises to the level of a "plan" or an "intention." Rather, Danforth expressed factually what would happen if he failed to receive help, not what he intended or threatened.

¶61 "The basis for involuntary civil commitment is the person's dangerousness." *In re Det. of Robinson*, 135 Wn. App. 772, 778, 146 P.3d 451 (2006). There is no danger in seeking help. In contrast, it is dangerous to increase the likelihood of reoffense by not seeking assistance. Danforth attempted to eliminate danger when he proactively asked the sheriff for refuge. To swallow one's pride and ask for help is noble, not criminal. Danforth should not be admonished for the honest recognition of his shortcomings; rather, he should be assisted with voluntary treatment, not incarcerated as a sexually violent predator.

¶62 The State has reacted in a perversely counterproductive manner by penalizing Danforth for seeking intervention to aid him in avoiding committing a sexually violent offense. If a person knows that the State will petition for his commitment as a sexually violent predator when he asks for help, then there is an incentive *not* to come forward and instead risk reoffending. As a society, we should encourage all former offenders, of any crime, to seek help if they fear they might commit new crimes. Accordingly, I would hold that Danforth's statements were not threats, reverse the trial and appellate courts' decisions that summary judgment was not appropriate, and remand to permit Danforth to vacate his stipulation so that this matter can be dismissed.

*If Not Limited to "True Threats," Former RCW 71.09.020(10) Is Overbroad*

¶63 Having concluded that the evidence falls far short of a "threat," we need go no further. But even if Danforth's statements could be characterized as threats, which they cannot, former RCW 71.09.020(10) must still meet constitutional requirements. Danforth claims that unless limited to "true threats" the statute is overbroad. " 'A law is overbroad if it sweeps within its prohibitions constitutionally protected free speech activities.' " *State v. Williams*, 144 Wn.2d 197, 206, 26 P.3d 890 (2001) (internal quotation marks omitted) (quoting *City of Bellevue v. Lorang*, 140 Wn.2d 19, 992 P.2d 496 (2000)). We must first determine whether the statute in question reaches a substantial amount of constitutionally protected free speech; "some burden on speech must exist before the protections of the First Amendment or article I, section 5 may be invoked." *State v. Immelt*, 173 Wn.2d 1, 7, 267 P.3d 305 (2011).

¶64 Again, a "recent overt act" is defined as "any act or threat" creating a reasonable apprehension of harm in the mind of an objective person knowing the history and mental condition of the person making the threat. Former RCW

71.09.020(10). On its face, this statute implicates a form of pure speech: threats. By its definition, a recent overt act can be speech, in the form of a threat, without any additional action or deeds.[14] The State argues that the First Amendment to the United States Constitution does not apply to former RCW 71.09.020(10) because additional proof of conduct is required to establish a recent overt act, i.e., " 'reasonable apprehension' in an objective person who knows his history and mental condition."[15] State's Resp. Br. at 23. This argument fails. In *Kilburn*, we evaluated a similar statute where "threat" is only a portion of the required elements. *State v. Kilburn*, 151 Wn.2d 36, 84 P.3d 1215 (2004).[16] Just like the "reasonable apprehension" prong here, which looks to past behavior, the harassment statute at issue in *Kilburn* includes a "reasonable fear" prong that also considers past

---

[14] I note that the Court of Appeals found that " '[v]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.' Threats used to establish a recent overt act under chapter 71.09 RCW produce special harms and are therefore not entitled to First Amendment protection." *In re Det. of Danforth*, 153 Wn. App. 833, 844, 223 P.3d 1241 (2009) (footnote omitted) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)). This determination is made without any analysis as to why threats in the context of chapter 71.09 RCW are different from any other threats or identification of the "special harms" produced. *Compare* RCW 9A.46.020, *with* former RCW 71.09.020(10).

[15] The State wants to have its cake and eat it too. It specifically states that "civil commitment does not operate to criminalize any speech. A civil commitment statute is not criminal and does not 'punish' a person for engaging in speech." State's Resp. Br. at 20 n.5. It then cites to no fewer than four criminal cases to support its proposition that speech is only one element of a successful commitment case. Citing to *United States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y. 2006), the State posits that speech may be used as evidence of dangerousness as it relates to the crime charged. Here, however, speech is not being used as evidence to prove another crime—speech is the only "crime" charged.

[16]
"(1) A person is guilty of harassment if:
    "(a) Without lawful authority, the person knowingly threatens:
    "(i) To cause bodily injury immediately or in the future to the person threatened or to any other person . . . [and]
    ". . . .
    "(ii) The person by words or conduct places the person threatened in reasonable fear that the threat will be carried out. . . ."
*Kilburn*, 151 Wn.2d at 41 (alterations in original) (quoting RCW 9A.46.020).

conduct. *Id*. at 41; *see also State v. Ragin*, 94 Wn. App. 407, 409-12, 972 P.2d 519 (1999) (evidence of prior bad acts necessary to prove reasonableness of victim's fear when defendant threatened him). We found that the statute in *Kilburn* implicated pure speech and " ' "must be interpreted with the commands of the First Amendment clearly in mind." ' " *Kilburn*, 151 Wn.2d at 41 (quoting *Williams*, 144 Wn.2d at 206-07) (quoting *Watts v. United States*, 394 U.S. 705, 707, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969))). I see no reason why former RCW 71.09.020(10) should escape First Amendment review.

¶65 The First Amendment prohibits laws abridging the freedom of speech. U.S. Const. amend. I. While most speech is protected, certain types of speech, including "true threats," fall outside the scope of protection. *Kilburn*, 151 Wn.2d at 42. "With respect to threats, the Supreme Court has held '[w]hat is a threat must be distinguished from what is constitutionally protected speech.' " *Williams*, 144 Wn.2d at 207 (alteration in original) (quoting *Watts*, 394 U.S. at 707). This court has "adopted an objective test of what constitutes a 'true threat'." *Kilburn*, 151 Wn.2d at 43. "A true threat is 'a statement made in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted as a serious expression of intention to inflict bodily harm upon or to take the life of another person.' " *State v. Schaler*, 169 Wn.2d 274, 283, 236 P.3d 858 (2010) (quoting *Williams*, 144 Wn.2d at 208-09). "Importantly, only threats that are 'true' may be proscribed. The First Amendment prohibits the State from *criminalizing* communications that bear the wording of threats but which are in fact merely jokes, idle talk, or hyperbole." *Id*. at 283 (emphasis added). "Under this standard, whether a true threat has been made is determined under an objective standard that focuses on the speaker." *Kilburn*, 151 Wn.2d at 44.

¶66 The lead opinion argues that "chapter 71.09 RCW is not a criminal statute and does not implicate the First

Amendment." Lead opinion at 71. Indeed, we have found that "[c]ommitments under Washington's sexually violent predators act are civil in nature." *In re Det. of Petersen*, 138 Wn.2d 70, 78, 980 P.2d 1204 (1999); *Young*, 122 Wn.2d at 23. First Amendment protection, however, is not limited to the criminal arena. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 927, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982) (In a civil lawsuit seeking injunctive relief and monetary damages, defendants could not be held liable for their speech because the statements were not "true threats" or " 'fighting words.' "); *Brown v. Entm't Merchs. Ass'n*, ___ U.S. ___, 131 S. Ct. 2729, 180 L. Ed. 2d 708 (2011) (California cannot impose a civil fine on the sale or rental of violent video games to children because this law violates the First Amendment.). Thus, the First Amendment protects speakers from both criminal and civil sanctions for their statements. *Claiborne Hardware Co.*, 458 U.S. at 928. The question is whether the SVPA impermissibly burdens protected speech.

¶67 In *Kilburn* we held that threats may not be sanctioned unless they are " 'true threats.' " *Kilburn*, 151 Wn.2d at 43. To avoid unconstitutional infringement of protected speech, former RCW 71.09.020(10) must be read as clearly prohibiting only "true threats." *Id.* Otherwise, the State could commit individuals to indefinite confinement based on their utterance of protected speech.

¶68 An analysis of Danforth's "threats" in the context of a recent overt act must necessarily satisfy the definition of a "true threat." Whether a statement is a true threat "is determined in light of the entire context, and the relevant question is whether a reasonable person in the defendant's place would foresee that in context the listener would interpret the statement as a serious threat . . . ." *Id.* at 46. As discussed above, Danforth's "threats" were not a serious expression of an intention to inflict bodily harm upon another, just the opposite. Danforth sought professional help to prevent himself from inflicting harm; he did not

want to injure anyone. He described events that he *feared* would occur if he did not get help. The MHPs, reasonable people with knowledge of Danforth's history and mental condition evaluating his "threats," concluded that he was not dangerous but rather "lonely" and "isolated." CP at 394.

¶69 Danforth's history and mental condition also indicate his statements were not true threats. On at least three previous occasions, Danforth attempted to commit himself for fear of reoffending. During times of crises, Danforth has a history of seeking help. Danforth has a constitutionally guaranteed right to seek assistance for his troubling desires and to describe his upsetting dreams, even to make threatening statements, as long as his words do not rise to the level of a "true threat." Because Danforth's "threats" do not rise to the level of a "true threat," as a matter of law the jury could not have found a recent overt act. Accordingly, I would reverse.

*If Requests for Help Are Threats, Former RCW 71.09.020(10) Is Unconstitutionally Vague*

¶70 " 'Under the due process clause of the Fourteenth Amendment, a statute is void for vagueness if either: (1) the statute "does not define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is proscribed"; or (2) the statute "does not provide ascertainable standards of guilt to protect against arbitrary enforcement." ' " *City of Bellevue v. Lorang*, 140 Wn.2d 19, 30, 992 P.2d 496 (2000) (quoting *State v. Halstien*, 122 Wn.2d 109, 117, 857 P.2d 270 (1993) (quoting *City of Spokane v. Douglass*, 115 Wn.2d 171, 178, 795 P.2d 693 (1990))). Danforth argues that the definition of "recent overt act" in former RCW 71.09.020(10) is vague because it fails to give notice that requests for help could "constitute grounds for an SVP commitment petition." Suppl. Br. of Pet'r at 17-18. He specifically asserts that "the word 'threat' is vague if it can be applied to his statements." *Id*. at 19. The State argues that the recent overt act requirement does not

implicate due process because we previously held that "RCW 71.09[ ] satisfies [the required] level of substantive due process." State's Suppl. Br. at 18 (citing *Young*, 122 Wn.2d at 26). After we decided *Young*, the legislature amended the statute, expanding the definition of "recent overt act" to include not only acts, but also "threats." Laws of 2001, ch. 286, § 4; former RCW 71.09.020(10). We have not reviewed former RCW 71.09.020(10) for vagueness. *In re Det. of Lewis*, 163 Wn.2d 188, 203, 177 P.3d 708 (2008) (Sanders, J., concurring).

¶71 Prior to involuntary commitment, due process requires that the State prove an individual is both mentally ill and dangerous. "[T]here must be proof of serious difficulty in controlling behavior." *Kansas v. Crane*, 534 U.S. 407, 413, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002). Because speech alone is alleged as the recent overt act, due process requires that Danforth's statements evince a lack of control. But Danforth's "threats" indicate that he had a handle on controlling his behavior. He did not act upon his dreams and thoughts of reoffending; rather he sought assistance. *Before* losing control, Danforth requested help. If asking for help is synonymous with "an expression of intent to inflict loss or harm on another," lead opinion at 73, "threat" is not sufficiently defined. Former RCW 71.09.020(10) does not provide adequate notice that an individual may be subject to indefinite confinement as a sexually violent predator if he seeks help to avoid reoffending. Therefore, it is unconstitutionally vague and violative of due process.

## CONCLUSION

¶72 In the movie *Minority Report* (Twentieth Century Fox et al. 2002), based on the short story of the same name by Philip K. Dick, "PreCrime" police act on premonitions of psychics to arrest perpetrators before they commit their crimes. Fortunately, we will never have PreCrime police so long as our courts require the State to confine state action

to due process of law, requiring a present showing of dangerousness before a suspect can be civilly committed for crimes not yet committed.

¶73 We recognize that there is a risk that Danforth might perpetrate a sexually violent crime. But Danforth is not alone in presenting such a risk. We cannot lock up every person who presents a risk of future violent crime. Indeed, we recoil from the thought of confining innocent men and women simply because a knowledgeable objective observer is reasonably apprehensive that man or woman will commit a crime. The State failed to show that Robert Danforth committed any recent act; to the contrary, Danforth sought help to avoid committing any crime. We should assist Danforth's efforts to control his urges instead of imprisoning him.

¶74 Accordingly, I dissent.

ALEXANDER, FAIRHURST, and STEPHENS, JJ., concur with WIGGINS, J.

After modification, further reconsideration denied February 21, 2012.